Mr. Chief Justice TANEY
 

 delivered the opinion of the court.
 

 This suit comes before the court upon a case stated, and is brought here by writ of error from the Circuit Court for the district of Maryland.
 

 The case in its material circumstances is this:
 

 On the 20th of August, 1842, the plaintiffs in error imported into the port of Baltimore, from Liverpool, certain merchandise particularly set forth in the record, which, at the port of Baltimore, was of the value of $44,346, as ascertained’by appraisement at the custom-house. Upon these goods the defendant in error, who was at that time the collector, acting in pursuance of orders and regulations made by the Treasury Department under the direction of the-President, demanded for duties twenty per cent, upon the value so ascertained; which amount was paid by the plaintiffs in error under protest; and this action instituted against the collector for the purpose of recovering back the money. There are some other circumstances mentioned in,the case stated, but-in the view which the court takes of the subject it is unnecessary to recapitulate them. The judgment of the Circuit Court was in favour of the defendant.
 

 The great question intended to be tried is, whether, under the act of Congress of March 2, 1833, the government was authorized to
 
 *24
 
 collect any duties upon goods imported after the. 30th of June, 1842, •without the^aid of further legislation by Congress?
 

 In expounding this, law, the. judgment of the court cannot,- in any degree, be influenced' by the construction placed'upon it by individual members.of Congress in the debate which took plaee on its passage^ nor by the motives or reasons assigned by. them for supporting or opposing amendments that were offered. . The law as it passed is the will of the majority of both houses; and the only mode in which that will'is spoken is in the act itself; and we must gather their intention from the -language there used, comparing it, when any ambiguity exists,-with the laws upon the same subject, and. looking, if necessary, to the public history of the times in which it was passed.
 

 The act in question is certainly not free from difficulty; and this -difficulty arises from, its peculiar, character. It .is commonly -called the. Compromise Aqt; and upon the face of it* it is .evident .that some-' thing was intended beyond the 'ordinary scope of legislation. Provisions are introduced in relation to the future action of Congress' upon the tariff, which can only be accounted for by regarding the act as a compromise of conflicting opinions on that subject, whereby a certain scale of duties was - fixed- upon and established until June , 30, 1842, and certain leading principles agreed upon, by which, after that timé, it was proposed, to regulate the action of-Congress, and the latter, as well as. the former, inserted in the law in the forms of legislation.. That this, whs the case is.abundantly manifested by several clauses in the act, and particularly in the 6th and last sec-, tion, which provides that" nothing contained in the act shall be construed to prevent the passage, prior or subsequent to the 30th of June, 1842,- of laws to prevent and punish evasions of the duties .imposed ■ by law, nor to prevent the passage. of any act prior to the day last mentioned, in the contingency of either excess or deficiency of the revenue, altering the rates of duties on articles which, under the act of July 14, 1832, were subject to a less fate of duty than twenty per cent., in such manner as not to exceed that rate, and so as to adjust the revenue .to either of the aforesaid , contingencies. Now it is impossible to suppose that Congress could have doubted its power to repeal, or modify afterwards, the .duties imposed by this act, in such manner as the public exigencies might require, or its power to pass laws to secure the collection of the revenue, and to punish any .one who might attempt to evade the duties imposed by an act of Con-, gress. If there had been nothing in this law out of the ordinary course of legislative action,.it would hardly have been deemed necessary to encumber it with these reservátions of power, which nobody doubted, and which Congress was continually exercising upon every other subject. - These provisions strongly mark its peculiar character. And this association Of positive and imperative enactments, with agreements for future action, has perhaps unavoidably occasioned some obscurity, and, as to some of the clauses, made it difficult at
 
 *25
 
 first sight to say whether the language was mandatory, or merely, declared the' principles by which it wa§ proposed that the legislation of. ■Congress should afterwards be governed.
 

 Taking this .view of . its general character and objects, die very large sum ultimately involved in the controversy makes it the duty of the court to proceed to a closer and more careful examination of its .different provisions. ' It is evidently supplementary to the act of July 14, 1832, and repeals only so much of that act, and of other previous acts, as are inconsistent with it. All of the duties, therefore, imposed by the act of 1832, or any other law, .and all the rulés and regulations provided for their collection, remain ih full force, unless they are in-. consistent with the act in question;
 

 The point to be determined then is, whether, after the 30th of June, 1842, the collection of duties imposed by the act of 1832, or by any other law as modified by the'act of 1833, is inconsistent with the last mentioned act. In other words, whether it repeals all previous laws imposing duties after the time above mentioned; and if it does not; whether it has failed to provide the necessary rules and regulations to enable,the proper officers to collect them.
 

 The 1st section declares that all' duties above twenty per cent, ad valorem, imposed by the act of 1832, or any previous laws, shall be reduced annually, at the rate therein mentioned, Until the 31st of December ,'T841; and that, after that time, the oné-half of the excess above twenty per cent, shall be deducted ; and from and after the 30th of June, 1842, the other half shall be deducted. Here the section stops; and so far, therefore, from repealing the whole duties, it by necessary implication continues a duty- of twenty per cent, after the 30th of June, 1842; for the direction to deduct the excess above that sum presupposes that a duty'to that amount is imposed and to be collected. The language used is equivalent to a positive enactment, that from and after the 30th of June, 1842,-the goods-therein mentioned shall'be charged with that-duty.
 

 The 2d section is .to the same effect. For after modifying the duties .imposed, by the act of 1832, in regard to the articles mentioned in that section, it declares that, these-duties shall be liable to the same deductions as are prescribed in . the 1st section — that is to say, the excess over twenty per cent, remaining on the 30th of June; 1842, is to be deducted; and consequently very'clearly implying that twenty per cent, is to be charged and collected after that period.
 

 The 3d section provides that the duties imposed by. existing laws, as modified by that act, shall remain and continue to be collected until the 30th of June, 1842; that after that time, all duties shall be collected in ready money;. and that such duties shall be laid as- are. necessary to an economical administration of the government, and shall be assessed upon the value of the goods at the port where they are entered, “ under such as be
 

 The latter words of this section relate to the
 
 *26
 
 by which the duties were- to be collected after the time specified, and that part of the controversy will be hereafter considered. The points to which our' attention is now directed is, whether, under this and the preceding acts of Congress, any duties continue to be imposed ; in other words, whether they were not all repealed by this act after the 30th of June, 1842. Certainly the provision that they shall be paid in cash, and assessed upon the home valuation, is no repeal. Can the provision, that such duties should be laid, after the time above mentioned, as were necessary to an economical administration of the government, be construed to repeal all the duties existing at that time? We think not. The court are not authorized to decide upon the amount of revenue necessary to an economical administration of the government. If is a question for the legislature. And the provision in tins clause of the section addresses itself to future legislative bodies, and’ not to the tribunals and officers whosé duty it is to carry into execution the laws of Congress. And we, should hardly be justified, by- any rule for the judicial interpretation of statutes, in pronouncing terms like these to be an implied repeal of all duties after the time specified, when -that construction would make the law. inconsistent with itself, by repealing, in the 3d section, the duties it had continued in force in the 1st and 2d. On the contrary, the true judicial inference would rather seem to be, that it was supposed, at the time of the passage of the act, .that the modified duties remaining imposed on the 30th of June, 1842, might produce the proper amount of revenue to be levied with a view to the economical administration of the government; but leaving it to Congress, when the time arrived, to alter and modify them in the manner and for the purposes specified in this act.
 

 The 4th section merely provides that certain enumerated articles shall be admitted to entry free from duty from December 31st, 1833, until the 30th of June, 1842, and therefore contains nothing that can influence the decision of the court.
 

 The 5th section declares certain articles free after the 30th of June, 1842, and then provides, that all imports on which the 1st section operates, and all articles, which were at the time of the passage of the law admitted to entry free from duty, or paying a less rate of duty than twenty per cent, ad valorem, before the 30th day of June, 1842, may be admitted to entry subject to such duty, not exceeding twenty per cent, as -shall be provided for by law; and this section, as well as the 3d, has been much relied on in opposition to the duty claimed by the government. But is it not like the clause in the 3d, of which we have already spoken, the language of compromise and agreement, and addressed to those who should'be afterwards called upon to legislate on the subject,, rather than to the administrative tribunals and officers of the country ? It reserves to Congress the right to reduce-the duties continued.by the 1st section below twenty per cent.; to impose duties on free articles, and to
 
 *27
 
 raise duties which were below twenty per cent, up to that amount. Yet nobody could have supposed that Congress would not have the power to do all this, if; it thought proper to exercise it, without any reservation of this description. The clause obviously was not introduced to reserve power, but with a view to the manner in which it should afterwards be exercised. As a mere question of power, Congress undoubtedly had authority, after the '30th June, 1842, as well as before, to impose any duties it saw fit upon the articles referred to, or upon any other imports. And it cannot be supposed that the Congress of 1833 intended to restrict, by force of law, the rights of a future Congress. Yet if we lose sight of the compromise character. of the act, and treat it as- an ordinary act of legislation, we should be bound to say, from the language used, that the Congress of 1833 supposed that the modifications of the revenue made by them could not be altered by a subsequent legislature, unless the right to do so was expressly reserved. No one would think of placing such a construction upon the section in question; and the difficulty is removed when we look at it in what we doubt not is its true light, and regard it as. a compromise of conflicting opinions, which it was believed would be afterwards respected, when it had thus been solemnly set forth in a law. In this view of the subject, it is not repugnant to the 1st and 2d sections, and leaves the duties retained by them in full force after the 30th of June, 1842, until they.should be altered by subsequent legislation.
 

 The 6th and last .section, the contents of which have been already stated, still more clearly marks the character of the act; and upon a view of the whole law, the court are of opinion that the duties which were in'force on the first -of July, 1842, continued in force, until they were afterwards changed by act of Congress.
 

 This brings us to the -remaining inquiry, whether, after the 30th of- June, 1842, there were any regulations in force, by which the officers of the m.venue were authorized to collect the duties which had not been repealed by the act of 1833; and this question may be disposed of in a few words, as.it rests altogether'upon the 3d section, the material parts of which have been already stated.
 

 Before the passage of the act of 1833, there were certainly regulations prescribed by law, abundantly sufficient for the collection of the revenue. The clause at-the close of _the 3d section, which directs that after the time so often referred to, the duties shall be assessed upon the value at the -port where the goods are entered, “ under such regulations as may be prescribed bylaw,” can scarcely be considered as an implied repeal- of all previous regulation^; for'it does not confine the regulations spoken of to such as might afterwards be enacted, but uses the ordinary legislative language appropriate to the subject, which natúrally and -evidently-embraces all regulations lawfully existing at the time, the home duties went ' into operación, whether made before or afterwards. They can, by
 
 *28
 
 no just .rule of' construction, be held to repeal pre-existing ones, nor.to require any new legislation upon the subject, unless, it should turn out that those already in force were insufficient for the purpose.
 

 But it has been urged that this clause, taken in connection with the new rule of home valuation,'then for the first time established, and to which they refer, shows that new regulations were contemplated, inasmuch as the 'existing legislátion upon that subject had been directed altogether to the value at the place of export. This argument would undoubtedly be entitled to great, weight, if the subsisting rules and regulations could not be applied to this new mode of assessing the duties. But if the regulations already in force were applicable to this new state of . things, there is no reason for -concluding that there was any intention to repeal them, even although it should appear that they had been framed with a view to the foreign value, and should be found more difficult of execution, and less satisfactory in' the result, when applied to the value at the port .of entry.
 

 ■ The most important regulations in relation to this part of the case are contmned in the 7th, 8th and 9ih sections of the act of July 14th, 1832, It is true, that these regulations point to. the value of the goods af the place of .export;. and many of the powers particularly conferred on the appraisers would not assist them in ascertaining the value at the place of import, and could not be used for that purpose.' But the substantial and manifest object of these regulations is to enable the proper officers to determine the ■ amount, upon which the rate of impost fixed by law is
 
 chargeable;
 
 and if the place, with reference to which the valuation is to be made, is changed, it does not by any means follow, that the powers before given to the officers, .and the duties imposed upon them, are not still to be exercised and performed so far. as they are applicable to the new-state of things.. The object - and intention of the valuation is still the same..' It is to execute the law, and to assess and collect the duty prescribed. Thus, for example, the 7th section of the act of 1832 declares, among other things, that it shall be the dpty of the appraisers, and of every person acting as such, by all reasonable ways or means in his power, to> ascertain, estimate, arid appraise the- true and actual value of the goods, at the time purchased and the place from which they were imported. The place of valuation is afterwards changed by the act of 1833, and the duty imposed according to the valu at the home port. It would be a most unreasonable interpretation " f the law, to say, that the appraisers must still go through the ceremony of estimating the value at the foreign port; or, that the mere change of place'repealed the authority to value at all. In both cases the only object of the appraisement is to ascertain the sum upon- which the duty is to be calculated; and the value of the goods at the foreign port, or at the home port, is of no importance to the public except in
 
 *29
 
 so far as it fixes the sum upon which the collector is to levy the fate of duty directed by law.
 

 the direction of the President, from time to time to establish such rules and regulations, not inconsistent with the laws of the United States, as the Preádent shall think .proper, to secure a just, faithful, and impartial appraisal of all goods,- wares, and merchandises, as aforesaid imported into the United States, and just and proper entries of such actual value thereof, and of the square yards, parcels,’ or other quantities, as the case may require, and of such' actual value of every of them; and it is made the duty- of the secretary of the Treasury to report all such rulés and regulations, with the reasons therefor, to the next session of Congress. It is very clear ■that any regulation^ within the authority thus given, are regulations prescribed by law. - And although, this section, as well as the others before mentioned, undoubtedly contemplated the value at the foreign port,- yet when the valuation is transferred to a home port, it was still the duty of the secretary of the Treasury to frame rulés and regulations to ascertain the value upon which .the law directed that the duty should be - assessed. For -this is the only object of the appraisement, an the only purpose for which rules-'and regulations , are to be framed.
 

 Indeed, when it is evident that under the act of. 1833 certain duties, as therein modified, were continued ;after the 3.0th of June, 1842, it would scarcely consist with judicial duty, to give an over-technical construction to. doubtftil words, which would make the legislature inconástent with itself, by imposing^ duty on goods im-. ported, and-at the' same time repealing alllaws by which that duty "could be collected. ' For it cannot be supposed that Congress, in qne and the same law, could so have' intended; and such an intention ought not\tobe implied, unless it was apparent from unequivocal-language. We think that there are no words'in-the act of 1833, from which such a design can fairly be inferred. ■
 

 It-appears from the case’stated, that tile, goods in question were subject to a duty of twenty per cent, -under the. 1st section of the last mentioned act; and that the duties in this case were.assessed accordingly upon the value of thé goods.at 1he port at which they entered, as ascertained and appraised, under the rules and regulations established by the secretary of the Treásury’under the direction- of the President. In the opinion of- the - court, they wqre lawfully assessed and collected, .and the judgment of the Circuit Court is-therefore affirmed.
 

 We forbear-to express an opinion upon the construction of the act of 1839, .which was argued in this case,’because tit is understood that other cases áre standing for argument, in which that question alone is involved; and it is proper to give the parties an opportunity - of being heard before the point-is decided.
 
 *32
 
 These provisions cannot, -by. any known rule of construction, be made to refer to^laws or regulations existing at the time, of their ■ enactment. They all refer to the ‘future r to futüre laws, and regulations prescribed by those,laws.
 

 The existing laws- made lio provision to carry into effect the changes in the system, introduced by .the act of 1833. Appraisers were appointed under former acts, but there was no law ór regula-- . -tion as to the home valuation.'. This was a most important matter, under the new system. ■ And it is perceived, from, the explicit provision of the act of 1833, that Congress did not intend to leave an arrangement of: so much importance' to the discretion of the secretary'of. the Treasury or of the President. They declare,...that the duties shall be assessed, “ under such regulations as
 
 may be
 
 prescribed by law;” This is not to be met by'argument. - It is matter of law. '
 

 No one can doubt, that laws in relation .to duties, not inconsistent with-the act of 1833, may be considered m giving á construction to that áct. But I am yet to learn, that such laws, by any construction, can suspend or modify the "positive enactments of the act of 1833. Such' a power, belongs not tó the executive nor the judiciary, but to Congress.