RAWLINSON, Circuit Judge, joined by Judge N.R. SMITH,
concurring in part and dissenting in part:
I concur in the majority’s conclusion that Arizona’s Proposition 200, which amended Ariz.Rev.Stat. § 16-579 to require proof of identification prior to receiving a ballot, does not violate the Voting Rights Act or the Equal Protection Clause of the Fourteenth Amendment. I also agree that the statutory amendment did not constitute a poll tax as proscribed in the Twenty-fourth Amendment to the United States Constitution. As a result, I join Part III of the majority opinion.
I respectfully dissent from the balance of the majority opinion, because I am not persuaded that application of Proposition 200’s proof-of-citizenship provision to prospective voters using the National Mail Voter Registration Form (the Federal Form) is precluded by the National Voting Rights Act (NVRA). In my view, there is no conflict between the NVRA and Arizona’s proof-of-citizenship requirement. In fact, the plain text of the NVRA validates Arizona’s proof-of-citizenship requirement, even while recognizing that Arizona must “accept and use” the Federal Form.
The text of the NVRA allows for Arizona’s proof-of-citizenship requirement, notwithstanding whether a presumption against preemption generally exists under the Election Clause, as it does under the Supremacy Clause. The NVRA states the following:
In addition to accepting and using the [Federal Form], a State may develop and use a mail voter registration form that meets all of the criteria stated in section 1973gg-7(b) of this title for the registration of voters in elections for Federal office.
42 U.S.C. § 1973gg-4(a)(2). Therefore, the plain text of the NVRA authorizes a state to “develop and use a mail voter registration form ... for the registration of voters in elections for Federal office,” in addition to the Federal Form if it “meets all of the criteria stated in section 1973gg-7(b).” As part of such criteria, the NVRA provides that a mail voter registration form “may require only such identifying information ... as is necessary to enable the appropriate State election official to assess the eligibility of the applicant ...” 42 U.S.C. § 1973gg-7(b)(l) (emphasis added). Section 1973gg-7(b)(2) then specifies that citizenship is a necessary eligibility *445 requirement. Thus, the NVRA expressly allows Arizona to require proof of eligibility, such as proof of citizenship, because “it is identifying information ... necessary to enable the ... State election official to assess eligibility,” and Arizona accepts and uses the Federal Form. See 42 U.S.C. § 1973gg-7(b)(1).
I emphasize the point that the NVRA itself expressly, not merely implicitly, authorizes a state to “develop and use” its own form “ ‘for the registration of voters in elections for Federal office,’ in addition to accepting and using the [Federal Form].” 42 U.S.C. § 1973gg-4(a)(2). Because a state must accept and use the Federal Form but is also expressly authorized to develop and use its own form that meets the criteria in § 1973gg-7(b), the plain text creates a minimum standard through the Federal Form and allows a state to require more as long as it is within the bounds of § 1973gg-7(b). See Hui v. Castaneda, — U.S.-, 130 S.Ct. 1845, 1855, 176 L.Ed.2d 703 (2010) (“We are required, however, to read the statute according to its text.... ”); Arkansas v. Farm Credit Servs. of Cent. Ark, 520 U.S. 821, 827, 117 S.Ct. 1776, 138 L.Ed.2d 34 (1997) (noting that it is a “basic principle that statutory language is to be enforced according to its terms”). While state forms must comply with the same general standards as the Federal Form, there is no mandate that states must use only the information included in the Federal Form or that the Federal Form is a complete application. See 42 U.S.C. § 1973gg-4(a)(2). States have the same discretion to decide the contents of the form they develop and use, when drafted in accordance with § 1973gg-7(b), as the Election Assistance Commission (EAC) had for the Federal Form’s requirements. See 42 U.S.C. §§ 1973gg-4(a)(2), 1973gg-7(b). Thus, the statute expressly authorizes a state, as long as it complies with the standards set forth in § 1973gg-7(b), to require additional information outside of the Federal Form for voter registration. I do not know how to more clearly and emphatically stress the point that the plain text of the statute allows Arizona to require proof-of-citizenship in elections for federal office.
The majority argues that the NVRA preempts the proof-of-citizenship requirement, because the NVRA’s requirement that “accept and use” the Federal Form and Proposition 200’s requirement to “ ‘reject any application for registration that is not accompanied by satisfactory evidence of United States citizenship’ ... do not operate harmoniously....” Majority Opinion, p. 398 (citing Ariz.Rev.Stat. § 16-166(F)). The majority rejects Arizona’s argument that the statutes are harmonious, because Arizona is accepting and using the Federal Form for voter registration as long as evidence of citizenship is provided pursuant to the state form requirement. See id. at 398-99. The majority reasons that rejecting voter registration based on anything outside the Federal Form is inappropriate because it “is contrary to the form’s intended use and purpose.” Id. at 399. Further, the majority opines that its reading is consistent with the “natural reading of the NVRA.” Id. at 398. I disagree.
The terms of the statute trump the intended use and purpose of the Federal Form. See Lockhart v. United States, 546 U.S. 142, 146, 126 S.Ct. 699, 163 L.Ed.2d 557 (2005) (“The fact that Congress may not have foreseen all of the consequences of a statutory enactment is not a sufficient reason for refusing to give effect to its plain meaning.”) (citation omitted); see also Siripongs v. Davis, 282 F.3d 755, 758 (9th Cir.2002) (“In interpreting the statute we look to general principles of statutory construction and begin with the language of the statute itself.” If the “language is *446 clear on its face, the sole function of the court is to enforce it according to its terms(citation, alteration and internal quotation marks omitted). Further, the “accept and use” provisions of the NVRA do not establish a conflict between Proposition 200 and the NVRA where one is not otherwise present in the text of the statutes. Reading the requirement to “accept and use” the Federal Form in § 1978gg-4(a)(l) along with § 1973gg-4(a)(2) does not naturally lead to the conclusion that no requirement outside the Federal Form may disallow a voter’s registration. The relevance and importance of § 1973gg-4(a)(2) is paramount. Invalidating the registration provision ignores § 1973gg-4(a)(2), which qualifies the extent to which a state must depend on the Federal Form for federal voter registration — i.e., the Federal Form is not the exclusive form.
The majority seems to read § 1973gg-4(a)(2) in such a way as to acknowledge a state’s right to develop and use its own form (if compliant with § 1973gg-7(b)), but at the same time opining that a state form cannot require anything more than the Federal Form does, or cause a voter to be ineligible to register to vote in federal elections. However, a more logical and appropriate reading is that the Federal Form acts as the default — setting minimum requirements — and a state may require additional requirements for federal elections through its own form if the requirements comply with the criteria of the statute (essentially setting the maximum available requirements that may be used in the state form). See La. Pub. Serv. Comm’n v. F.C.C., 476 U.S. 355, 370, 106 S.Ct. 1890, 90 L.Ed.2d 369 (1986) (“[Wjhere possible, provisions of a statute should be read so as not to create a conflict. ...”). Therefore, there is flexibility coupled with control through the standards in § 1973gg-7(b). The Federal Form acts as a baseline while the criteria in § 1973gg-7(b) act as outer limits.
The requirement to “accept and use” the Federal Form does not preclude states from imposing additional requirements. Accepting and using something does not mean that it is necessarily sufficient. For example, merchants may accept and use credit cards, but a customer’s production of a credit card in and of itself may not be sufficient. The customer must sign and may have to provide photo identification to verify that the customer is eligible to use the credit card. Second, the ordinary and natural meaning of the word “use” is “to employ” or “derive service from ... ”. Smith v. United States, 508 U.S. 223, 228-29, 113 S.Ct. 2050, 124 L.Ed.2d 138 (1993) (citation omitted). The word “accepts” means “to adopt, to agree to carry out provisions, to keep and retain.” Worden v. SunTrust Banks, Inc., 549 F.3d 334, 344 (4th Cir.2008) (citing Black’s Law Dictionary 12 (5th ed.1979)). It is undisputed that Arizona. has employed and derived service from the Federal Form and adopted its use for the registration of voters in federal elections. The only real issue is whether Proposition 200’s requirement of proof of citizenship so conflicts with the use of the Federal Form that the requirement of proof of citizenship should be voided.
I realize that the majority’s argument that “rejecting” necessarily counters “accepting” has some superficial appeal. See Majority Opinion, p. 398. However, what is being decided is whether states must accept and use the Federal Form in their federal election procedures as a whole, or whether they must accept the Federal Form as completely sufficient and the sole requirement for voter registration. Thus, the point of contention is whether Arizona defies the demand to accept and use the Federal Form by not finding voter regis *447 tration wholly sufficient based solely on the Federal Form. The answer cannot be that the Federal Form is the end-all-be-all. Section 1973gg-4(a)(2) clarifies that “accept and use” cannot mean that a state must allow a voter to register solely on the basis of the Federal Form, because it specifically allows a state to develop and use a state form, in addition to the Federal Form, for federal elections. It is beyond my understanding how the Federal Form can be considered “the end” when the NVRA explicitly allows states to develop and use a form “[i]n addition to accepting and using the [Federal Form].” 42 U.S.C. § 1973gg-4(a)(2) (emphasis added).
No provision of the NVRA expressly forbids states from requiring additional identifying documents to verify a voter’s eligibility. The NVRA only expressly prohibits states from requiring “notarization or other formal authentication.” 42 U.S.C. § 1973gg — 7(b)(3). “We ... read the enumeration of one case to exclude another [if] it is fair to suppose that Congress considered the unnamed possibility and meant to say no to it----” Barnhart v. Peabody Coal Co., 537 U.S. 149, 168, 123 S.Ct. 748, 154 L.Ed.2d 653 (2003) (citation omitted). Here, Congress prohibited requiring notarization or other formal authentication but failed to prohibit proof-of-citizenship, while expressly recognizing its importance in voter registration. See 42 U.S.C. § 1973gg-7(b); see also Kucana v. Holder, — U.S.-, 130 S.Ct. 827, 838, 175 L.Ed.2d 694 (2010) (“Where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.” (alteration and citation omitted)). Nor does the NVRA state that it is the exclusive authority on eligibility verification or that “Arizona’s only role was to make [the Federal] [F]orm available to applicants and to ‘accept and use’ it for the registration of voters.” Majority Opinion, p. 400 (emphasis added). The language of the statute not only does not prohibit additional documentation requirements, it expressly permits states to “require ... such identifying information ... as is necessary to enable the appropriate State election official to assess the eligibility of the applicant ...” 42 U.S.C. § 1973gg-7(b)(l).
If, as the majority believes, the requirement to accept and use the Federal Form and the express allowance for a state to develop and use a form that complies with the set criteria of the statute are contradictory, see Majority Opinion, pp. 398-401,. then the court “must interpret the statute to give effect to both provisions where possible.” See Ricci v. DeStefano, 557 U.S. 557, 129 S.Ct. 2658, 2674, 174 L.Ed.2d 490 (2009) (citation omitted). Here, it is possible and necessary to interpret the statute as requiring states to accept and use the Federal Form, while allowing states to demand adherence to their form and specific requirements for federal voter registration if in compliance with § 1973gg-7(b).
Reading the statute as a whole solidifies my conclusion that Arizona’s registration provision is valid. See Samantar v. Yousuf, - U.S. -, 130 S.Ct. 2278, 2289, 176 L.Ed.2d 1047 (2010) (“We do not ... construe statutory phrases in isolation; we read statutes as a whole.” (citation and alteration omitted)); see also, K Mart Corp. v. Cartier, Inc., 486 U.S. 281, 291, 108 S.Ct. 1811, 100 L.Ed.2d 313 (1988) (“In ascertaining the plain meaning of the statute, the court must look to the particular statutory language at issue, as well as the language and design of the statute as a whole....”) (citation omitted). Besides the express authorization for a state to “develop and use” a form compliant with *448 the statute’s criteria, 42 U.S.C. § 1973gg-4(a)(2), the NVRA also provides that “each State shall establish procedures to register to vote in elections for Federal office ... (2) by mail application pursuant to section 1973gg-4 of this title, ... in addition to any other method of voter registration provided for under State law,” id. § 1973gg-2(a) (emphasis added). Although the NVRA requires that states “accept and use” the Federal Form, id. § 1973gg-4(a)(2), the NVRA does not foreclose states from using other methods for registering voters, id. § 1973gg-2(a), and allows states to develop and use state specific forms, if those forms fit within set criteria, id. § 1973gg-4(a)(2). Therefore, Congress did not “assume exclusive .control of the whole subject.... ” Ex Parte Siebold, 100 U.S. 371, 383, 25 L.Ed. 717 (1879) (emphasis in the original). Arizona is allowed to require proof of citizenship for federal voter registration because of its expressly granted authority to develop and use a form complying with § 1973gg-7(b), and Arizona may deny voter registration for federal office for lack of such proof. See id. at 392 (“[W]e think it clear that the clause of the Constitution relating to the regulation of such elections contemplates such cooperation whenever Congress deems it expedient to interfere merely to alter or add to existing regulations of the State____”).
The majority notes that, if Arizona is correct that §§ 1973gg-4(a)(2) and 1973gg-7(b) allow the registration provision, “this would mean only that the NVRA allows Arizona to include a proof of citizenship requirement on its State Form.” Majority Opinion, p. 400 (citation omitted). “It would not mean that Arizona has authority to add this requirement to the Federal Form ...” Id. However, this conclusion ignores the specific language of § 1973gg-4(a)(2). That language allows states to develop and use a state form complying with the statute’s criteria for federal elections.
The majority also asserts that, even if the NVRA allows a state form to include additional conditions within the parameters of § 1973gg-7(b) (like proof-of-citizenship), a state may not decline an applicant’s voter registration for federal elections because of the applicant’s failure to satisfy the additional conditions. See Majority Opinion, pp. 398-400. According to the majority,
[t]he NVRA’s State Form provision, § 1973gg-4(a)(2), merely gives a state more options [and] Congress could have required all states to use only the Federal Form ... Instead, Congress allowed States to use their state registration forms to register applicants for both state and federal elections (provided the state form complies with § 1973gg-7(b)). But states cannot reject applicants who register for federal elections who use the Federal Form.... Majority Opinion, pp. 398-400 (emphasis by the majorityXfootnote reference omitted).
Again, the majority’s attempt to rebut Arizona’s arguments and this dissent contradicts the language of the NVRA and leads to an absurd result. Under the majority’s argument, the state form (and the additional conditions allowed in the state form) have no real effect, because the applicant must only meet the Federal Form requirements in order to register for federal elections. Thus, Arizona must allow an applicant, satisfying all but the proof-of-citizenship requirement, to be registered to vote in federal elections, while not allowing the applicant to be registered for state elections. This faulty interpretation contradicts the NVRA’s plain language that “a State may develop and use a mail voter registration form that meets all of the criteria stated in section 1973gg-7(b) of *449 this title for the registration of voters in elections for Federal office.” 42 U.S.C. § 1973gg-4(a)(2) (emphasis added). Put differently, under the majority’s view, a state “registration form that meets all the criteria stated in section 1973gg-7(b)” but that includes an additional condition beyond the Federal Form requirements may not be used to register “voters in elections for Federal office,” although the state form is specifically allowed by the language in § 1973gg-4(a)(2).
In addition, the majority believes that my interpretation of § 1973gg-4(a)(2) substitutes “instead of’ for “[i]n addition to.” Majority Opinion, p. 399. However, my interpretation is loyal to the wording “[i]n addition to,” because the Federal Form requirements must be met. State form requirements, constrained by § 1973-gg-7(b), are added to the Federal Form requirements. In contrast, the majority’s view of § 1973gg-4(a)(2) basically strikes the statute’s text allowing state forms to be used “[i]n addition to” the Federal Form “for the registration of voters in elections for Federal office.”
The majority’s view makes voter registration burdensome for states. For example, an Arizona applicant meeting the Federal Form requirements, but lacking proof-of-citizenship, would have to be allowed to vote for federal officials but could not vote for state officials. States that desire a proof-of-citizenship requirement in their state forms (as the majority suggests is allowed by the NVRA), would be forced to track whether their residents are registered to vote for federal elections, state elections, or both. In essence, the majority’s alteration of the statute imposes an unnecessary burden on the states. Although “it is not our task to assess the consequences of each approach and adopt one that produces the least mischief[,]” Lewis v. City of Chi, Ill, — U.S.-, 130 S.Ct. 2191, 2200, 176 L.Ed.2d 967 (2010), the majority’s view, ignoring the plain meaning of the NVRA, cannot be what Congress intended. This is especially true when one considers that the statutory allowance for a state form does not displace the importance of the Federal Form or the delegated authority to the EAC to determine the contents of the Federal Form. The Federal Form maintains its importance, because its use is required in all states. The Federal Form, therefore, establishes a minimum set of requirements. The EAC’s rejection of Arizona’s request to include a proof-of-citizenship requirement demonstrates that the EAC served its purpose of establishing a minimum (not a maximum) set of requirements for all states. Then, states individually are allowed to impose additional requirements within the strict bounds of § 1973gg-7(b).
The majority believes that the proof-of-citizenship requirement disrupts the goal of the NVRA — to streamline the registration process. See Majority Opinion, pp. 400-01. Although the NVRA seeks to simplify and harmonize registration procedures, the statute also identifies “protecting] the integrity of the electoral process” and “enhancing] the participation of eligible citizens as voters in elections for Federal office” as guiding purposes of the statute. 42 U.S.C. § 1973gg(b) (emphasis added). Even under the majority’s complementary analysis conducted pursuant to Siebold and Foster v. Love, 522 U.S. 67, 118 S.Ct. 464, 139 L.Ed:2d 369 (1997), see Majority Opinion, p. 394, Arizona’s proof-of-citizenship procedure complements— rather than conflicts with — these important purposes. See Siebold, 100 U.S. at 384; Foster, 522 U.S. at 74, 118 S.Ct. 464 (holding that a state election law is preempted only “to [the] extent [that] it conflicts with federal law”). The stated *450 harmonious purposes are not served if ineligible voters are allowed to register.
Finally, even though allowing states to “develop and use” their own forms (if compliant with § 1973gg-7(b)) may decrease the efficiency of a Federal Form, this policy consideration cannot overrule the express terms of the statute. DePierre v. United States, — U.S. -, 131 S.Ct. 2225, 2233, 180 L.Ed.2d 114 (2011) (“That we may rue inartful legislative drafting, however, does not excuse us from the responsibility of construing a statute as faithfully as possible to its actual text....”) (footnote reference omitted); Lewis, 130 S.Ct. at 2200 (“Truth to tell, however, both readings of the statute produce puzzling results.... In all events, it is not our task to assess the consequences of each approach and adopt the one that produces the least mischief. Our charge is to give effect to the law Congress enacted.... ”); of. United States v. Kennedy, 643 F.3d 1251, 1266 (9th Cir.2011) (Ikuta, J.) (determining that a statute compensating victims of child pornography was “a poor fit for these types of offenses[,]” but acknowledging that “the responsibility lies with Congress, not the courts, to develop a scheme to ensure that defendants ... are held liable ...”).
In sum, the majority’s holding hinges on § 1973gg-4(a)(l)’s requirement that states “accept and use” the Federal Form. However, § 1973gg-4(a)(2) also allows a state to “develop and use” its own form if it complies with the standards delineated in § 1973gg-7(b). Therefore, it is difficult to maintain that Arizona’s registration provision squarely conflicts with the NVRA or that the NVRA “assume[s] exclusive control of the whole subject....” Siehold, 100 U.S. at 383 (emphasis in the original).[1]
*451 Siebold meticulously outlined the interplay between election regulations promulgated by a state government and Congress respectively. In the process, the United States Supreme Court took care to emphasize the respect that should be accorded the procedures implemented by states. See Siebold, 100 U.S. at 394 (“State rights and the rights of the United States should be equally respected. Both are essential to the preservation of our liberties and the perpetuity of our institutions. But, in endeavoring to vindicate the one, we should not allow our zeal to nullify or impair the other.”) (emphasis added).
The Supreme Court recognized the right of Congress to exercise its power to enact voting regulations that would supersede regulations promulgated by a state. See id. at 393. However, the Supreme Court also noted that “we are bound to presume that Congress has done so in a judicious manner; that it has endeavored to guard as far as possible against any unnecessary interference with State laws and regulations ...” Id.
The Supreme Court further reasoned that the power of Congress to enact statutes governing state matters “does not derogate from the power of the State to execute its laws at the same time and in the same places....” Id. at 395 (emphasis added). The laws of the state are preempted if, and only if, “both cannot be executed at the same time.... ” Id. (emphasis added).
In Siebold, there was no dispute regarding a conflict between the state and federal regulations. Rather, the question raised was whether Congress may enact partial regulations to be implemented together with state regulations governing election procedures. See id. at 382. Having an *452 swered that question in the affirmative, the Supreme Court denied the writ of habeas corpus filed by defendants who were convicted of violating the federal laws. See id. at 374, 399.
Foster, the more recent case, addressed an actual conflict between a state law and a federal law. Indeed, in Foster a blatant conflict existed between federal statutes requiring Congressional elections to be held “the Tuesday after the first Monday in November in an even-numbered year” and a state statutory scheme under which no election was held on the date designated by Congress if a candidate received a majority of the votes during an earlier “open primary” election. 522 U.S. at 68-69, 118 S.Ct. 464.
The Supreme Court explained that the issue to be decided was “a narrow one turning entirely on the meaning of the state and federal statutes ...” Id. at 71, 118 S.Ct. 464 (emphasis added). The Court defined election as encompassing “the combined actions of voters and officials meant to make a final selection of an officeholder ...” Id. The Court noted that Congress had established the Tuesday following the first Monday in November as “the day” for electing members of Congress. Id. Because the system in Louisiana was “concluded as a matter of law before the federal election day, with no act in law or in fact to take place on the date chosen by Congress,” the Louisiana statute conflicted with 2 U.S.C. § 7, and was preempted. Id. at 73, 118 S.Ct. 464.
Because no Congressional election was to be held on the date Congress explicitly designated as “the day” for holding Congressional elections, the Louisiana statutory scheme clearly and directly conflicted with § 7. Reiterating that federal law “mandates holding all elections for Congress ... on a single day throughout the Union,” id. at 70, 118 S.Ct. 464, the Court voided Louisiana’s statutory scheme. See id. at 74, 118 S.Ct. 464.
Unlike the statutory scheme voided in Foster, Proposition 200’s proof-of-eitizenship provision does not present the blatant conflict addressed by the Supreme Court in that case. Indeed, the majority rests its analysis on what it perceives to be the “expansive” sweep of the Elections Clause. Majority Opinion, p. 391 n. 8. However, the message from Siebold is to the opposite effect. After taking great pains to emphasize the equal role of the states in preserving the integrity of federal elections, the Supreme Court counseled that we should not hasten to declare preemption of a state statutory scheme. Indeed, Siebold expressly held that the paramountcy of federal law extends only “so far as the two are inconsistent, and no farther. ...” Siebold, 100 U.S. at 386. The Court clarified that state and federal enactments conflict only “[i]f both cannot be performed ...” Id.
Foster couched its holding in similar fashion, clarifying that the preeminence of federal statutes over state statutes applies only to the extent that the two conflict, and only “so far as the conflict extends ...” Foster, 522 U.S. at 69, 118 S.Ct. 464, (quoting Siebold, 100 U.S. at 384).
In making the determination whether the Louisiana statutory scheme violated 2 U.S.C. § 7, the Supreme Court focused on the word “election” as used in § 7. Id. at 71. The Court consulted a dictionary for the definition of “election” to determine if a conflict existed between Louisiana’s statutory scheme and § 7.
It is important to remember that the Supreme Court opined that State enactments are superseded by Federal enactments only “[i]f both cannot be performed ...” Siebold, 100 U.S. at 386. As applied in Foster, the state statutory scheme was *453 voided because it was impossible to hold a Congressional election on the designated day if the election was in fact completed on an earlier date. See Foster, 522 U.S. at 73.
In my view, the majority opinion has stretched the principle established in Siebold and applied in Foster beyond its intended bounds.[2]
Indeed, both Siebold and Foster took care to delineate that preemption extended only as far as a conflict exists, and no farther. See Siebold, 100 U.S. at 386; Foster, 522 U.S. at 69, 118 S.Ct. 464. And a conflict exists only if the two regulations cannot coexist. See Siebold, 100 U.S. at 386. As discussed above, such is not the case for Proposition 200’s requirement that a prospective voter present proof of citizenship, when considered with the contents of the Federal Form.
The fact that the NVRA contains a provision precluding the requirement of “notarization of other formal authentication” in no way conflicts with Proposition 200’s proof-of-citizenship requirement. Notarization and authentication are concerned with the genuineness of an executed document. See, e.g., Federal Rule of Evidence 901(a) (“The requirement of authentication ... is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims.”); see also In re Big River Grain, Inc., 718 F.2d 968, 971 (9th Cir.1983) (noting that “the notary’s function is to protect against recording false instruments ... ”). In contrast, Proposition 200’s proof-of-citizenship requirement has nothing to do with notarization or authentication and everything to do with affirming eligibility for registration. Because the requirements of both the NVRA and Proposition 200 may be met without conflict, they can easily coexist under the Election Clause. See Siebold, 100 U.S. at 386; Foster, 522 U.S. at 69, 118 S.Ct. 464. As both statutes may be enforced with no conflict, the NVRA does not pre-empt Proposition 200. See id. For that reason, I would affirm the district court’s grant of summary judgment to the State of Arizona. I respectfully dissent from the majority’s conclusion to the contrary.

. Chief Judge Kozinski describes the NVRA as "readily susceptible to the interpretation of the majority, but also that of the dissent....” Concurring Opinion, p. 439. His well-drafted dissent to the original panel opinion said it better. See Gonzalez v. Arizona (Gonzalez II), 624 F.3d 1162, 1206 (9th Cir.2010) (Kozinski, J., dissenting) ("The NVRA doesn't say that states must treat the federal form as a complete application.... There’s no question that Arizona accepts and uses the federal form for the information contained in it. Arizona only asks for proof of citizenship in addition to the form in order to complete the registration process.”), reh'g en banc granted & opinion withdrawn, 649 F.3d 953 (9th Cir.2011). This en banc concurrence discusses the statutory language "accept and use” in isolation, with no reference to the "[i]n addition” language in 42 U.S.C. § 1973gg-4(a)(2), see Concurring Opinion, pp. 439-42 again diverging from his prior dissent, where he noted: "[S]ection 1973gg-4(a)(2) ... allows states to 'develop and use’ their own form if it 'meets all of the criteria stated in section 1973gg-7(b).’ [Gonzalez v. Arizona (Gonzalez I), 485 F.3d 1041 (9th Cir.2007),] reads the statute correctly; it is the majority here that is mistaken.” Gonzalez II, 624 F.3d at 1205. In fact, Chief Judge Kozinski previously identified a basic problem with the majority's view via a single question: "[I]f the statute permits zero deviation from the federal form, why permit states to develop their forms at all? The only development needed would be photocopying the federal form.” Id. at 1209.
To determine its meaning, all of the NVRA’s language must be read together and not in isolation. See Samantar, 130 S.Ct. at 2289 ("We do not ... construe statutory phrases in isolation; we read statutes as a whole....”) (citation and alteration omitted). When read together, the meaning is clear. States must accept and use the Federal Form for registering voters for federal elections, but may also develop and use a state form with additional conditions if they comply with § 1973gg-7(b). When the meaning of the statute is clear, reverting to legislative history is inappropriate. See Exxon Mobil Corp. v. Allapattah Servs., Inc., 545 U.S. 546, 567, 125 S.Ct. 2611, 162 L.Ed.2d 502 (2005); see also Hamdan v. Rumsfeld, 548 U.S. 557, 665-68, 126 S.Ct. 2749, 165 L.Ed.2d 723 (2006) (Scalia, J., dissenting) ("We have repeatedly held that ... reliance [on legislative history] is impermissible where, as here, the statutory language is unambiguous....”).
The legislative history is also unhelpful here because it is unreliable. "[L]egislative history *451 is itself often murky, ambiguous, and contradictory.” Exxon Mobil, 545 U.S. at 568, 125 S.Ct. 2611; see also Conroy v. Aniskoff, 507 U.S. 511, 519, 113 S.Ct. 1562, 123 L.Ed.2d 229 (1993) (Scalia, J., concurring) ("The greatest defect of legislative history is its illegitimacy. We are governed by laws, not by the intentions of legislators. As the Court said in 1844: 'The law as it passed is the will of the majority of both houses, and the only mode in which that will is spoken is in the act itself....”') (quoting Aldridge v. Williams, 44 U.S. 9, 24, 3 How. 9, 11 L.Ed. 469 (1845) (emphasis in the original)). In fact, this case is a glaring example of the flaws of using legislative history. Although the legislative history cited by Chief Judge Kozinski supports his reasonable argument, the original view of the NVRA’s sponsor casts doubt on the clarity of that legislative history. Senator Ford, the sponsor of the bill, thought that “there is nothing in the bill now that would preclude the State's requiring presentation of documentary evidence of citizenship.” 139 Cong. Rec. S2897-4, at S2902 (Mar. 16, 1993). He thought that an amendment specifying that a state could require proof-of-citizenship was redundant. See id. Therefore, even though the Conference Committee opined that the unamended NVRA disallowed proof-of-citizenship, H.R.Rep. No. 103-66, at 20 (1993), reprinted in 1993 U.S.C.C.A.N. 140, 148-49 (Conf.Rep.), it is unclear how many of the members of Congress who voted for the NVRA agreed with Senator Ford. See Exxon Mobil, 545 U.S. at 570, 125 S.Ct. 2611 ("The utility of either can extend no further than the light it sheds on how the enacting Legislature understood the statutory text. Trying to figure out how to square the Subcommittee Working Paper’s understanding with the House Report’s understanding, or which is more reflective of the understanding of the enacting legislators, is a hopeless task.”); cf. Hamdan, 548 U.S. at 666, 126 S.Ct. 2749 (Scalia, J., dissenting) ("Whether the floor statements are spoken where no Senator hears, or written where no Senator reads, they represent at most the views of a single Senator....”). As has been previously said, "[¡judicial investigation of legislative history has a tendency to become, to borrow Judge Leventhal's memorable phrase, an exercise in 'looking over a crowd and picking out your friends.’ ” Exxon Mobil, 545 U.S. at 568, 125 S.Ct. 2611 (quoting Patricia M. Wald, Some Observations on the Use of Legislative History in the 1981 Supreme Court Term, 68 Iowa L.Rev. 195, 214 (1983)).

. I do not agree that the cases cited on pages 4126-27 n.8 of the majority opinion establish that the Supreme Court has "construed Congress's authority under the Election Clause expansively." Rather, in the earlier years of this nation’s existence, when many states resisted the notion of a centralized government, these cases served to emphasize that federal elections conducted in the various states were subject to federal regulation. See, e.g., The Ku Klux Cases, 110 U.S. 651, 657-58, 4 S.Ct. 152, 28 L.Ed. 274 (1884) ("If this government is anything more than a mere aggregation of delegated agents of other states and governments, each of which is superior to the general government, it must have the power to protect the elections on which its existence depends, from violence and corruption....”); id. at 662, 4 S.Ct. 152 ("This proposition answers, also, another objection to the constitutionality of the laws under consideration, namely, that the right to vote for a member of congress ... is governed by the law of each state respectively.... ”).