# THE STATE OF SOUTH CAROLINA
## In The Supreme Court

Candace Eidson, on behalf of herself and her minor child; Coneitra Miller, on behalf of herself and her minor child; Joy Brown, on behalf of herself and her minor children; Crystal Rouse, on behalf of herself and her minor children; Amanda McDougald Scott, on behalf of herself and her minor child; Penny Hanna, on behalf of herself and her minor children; the South Carolina State Conference of the NAACP; and The South Carolina Education Association, Petitioners,

v.

South Carolina Department of Education; Ellen Weaver, in her official capacity as State Superintendent of Education; South Carolina Office of the Treasurer; and Curtis M. Loftis, Jr., in his official capacity as State Treasurer of South Carolina, Respondents,

and

Henry D. McMaster, in his official capacity as Governor of the State of South Carolina; Thomas C. Alexander, in his official capacity as President of the South Carolina Senate; and G. Murrell Smith, Jr., in his official capacity as Speaker of the House of Representatives, Intervenors-Respondents.

Appellate Case No. 2023-001673

---

## IN THE COURT'S ORIGINAL JURISDICTION

---

Opinion No. 28235
Heard March 6, 2024 – Filed September 11, 2024

---

**RELIEF GRANTED IN PART**

---

W. Allen Nickles, III, of Nickles Law Firm, of Columbia; William P. Tinkler, of Tinkler Law Firm LLC, of Charleston; Grace Rybak, Kristen L. Hollar, Ramya Ravindran, and Alice M. O'Brien, all of Washington DC; Wendy Lecker and Jessica Levin, both of Newark, NJ, all for Petitioner Candace Eidson, on behalf of herself and her minor child, et al.

Kaye Gorenflo Hearn, of Conway; and Robert Brian Critzer, of Wyche, PA, of Columbia; Grace Rybak, Kristen L. Hollar, Ramya Ravindran, and Alice M. O'Brien, all of Washington DC, for Petitioner South Carolina Education Association.

Glynnis Alexia Hagins, of Hamlet, NC, for Petitioner South Carolina State Conference of the NAACP.

Miles Edward Coleman, of Nelson Mullins Riley & Scarborough, LLP, of Greenville; and Daniel R. Suhr, of Chicago, IL, all for Respondents South Carolina Department of Education and Ellen Weaver in her official capacity.

Attorney General Alan McCrory Wilson, Solicitor General Robert D. Cook, Deputy Solicitor General J. Emory Smith, Jr., and Assistant Deputy Attorney General Harley Littleton Kirkland, all of Columbia, for the Office of Treasurer and Curtis M. Loftis, Jr., State Treasurer of South Carolina, Respondents.

Matthew Todd Carroll and Kevin A. Hall, both of Womble Bond Dickinson, LLP, of Columbia, for Intervenor Thomas C. Alexander, President of the South Carolina Senate.

Chief Legal Counsel Thomas Ashley Limehouse, Jr., Senior Litigation Counsel William Grayson Lambert, and Deputy Legal Counsel Erica Wells Shedd, of the Office of the Governor, of Columbia, for Intervenor Henry D. McMaster as Governor of the State of South Carolina.

James Keith Gilliam and Bradley Scott Wright, both of Burr & Forman, LLP, of Greenville, for Intervenor G. Murrell Smith, Jr., as Speaker of the House of Representatives.

Richard S. Dukes, Jr., of Charleston; and R. Hawthorne Barrett, of Columbia, both for the Bishop of Charleston, a Corporation Sole, and the Notre Dame Law School Education Project Amici Curiae.

Jay Thompson and Diana Marie August, both of Murphy & Grantland, P.A., of Columbia, for the Cato Institute Amicus Curiae.

Harvey M. Watson, III, of Ballard & Watson, of West Columbia; and Adam Leavitt Sanders, of Southern Pines, NC, both for Classical Conversations, Inc. Amicus Curiae.

Robert T. Bockman, of the Law Center, of Columbia, for Derek W. Black, Constitutional Law Professor Amicus Curiae.

Christopher Ernest Mills, of Charleston, for the Liberty Justice Center, American Federation for Children, Americans for Prosperity Foundation, Manhattan Institute for Policy Research, and Reason Foundation Amici Curiae.

Burl Franklin Williams, of Burl F. Williams, P.A., of Greenville; Donald A. Daugherty and Martha A. Astor, both of Defense of Freedom Institute for Policy Studies, of Washington DC, all for Mitchell M. Zais and Barbara S. Nielsen (deceased) Amici Curiae.

Kenneth B. Wingate and Adam Miles Crain, both of Sweeny, Wingate & Barrow, P.A., of Columbia, for Palmetto Family Council Amicus Curiae.

Timothy J. Newton, of Murphy & Grantland, P.A., of Columbia, for Palmetto Promise Institute Amicus Curiae.

James Paul Porter and Elizabeth Marie Bowen, both of Cromer Babb & Porter, LLC, of Columbia, for Palmetto State Teachers Association Amicus Curiae.

Matthew Paul Cavedon, of Amagi Law, LLC, of North Augusta; Thomas M. Fisher, of EdChoice Legal Advocates, of Indianapolis, IN; David G. Hodges, of Institute for Justice, of Arlington, VA; and Michael Bindas, of Institute for Justice, of Seattle, WA, all for Partnership for Educational Choice Amicus Curiae.

Vordman Carlisle Traywick, III, of Robinson Gray Stepp & Laffitte, LLC, of Columbia; Erik S. Jaffe, Annika Marie Boone Barkdull, and Gene C. Schaerr, all of Schaerr Jaffe LLP, of Washington DC, all for Protect the First Foundation Amicus Curiae.

John Marshall Reagle, Connie Pertrice Jackson, and Susan Marie Fittipaldi, all of Halligan Mahoney Williams Smith Fawley & Reagle, PA, of Columbia, for SC School Boards Association and SC Association of School Administrators Amici Curiae.

Attorney General Alan McCrory Wilson, Assistant Deputy Solicitor General Thomas Tyler Hydrick, and

Assistant Deputy Solicitor General Joseph David Spate, all of Columbia, for South Carolina Attorney General Alan McCrory Wilson Amicus Curiae.

Kathleen McColl McDaniel, Grant Burnette LeFever, Lydia Robins Hendrix, all of Burnette Shutt & McDaniel, P.A., of Columbia, for T. Jameson Brewer, Joshua Cowen, Suzanne Eckes, Christopher Lubienski, Julie Mead, and Kevin Welner, who are Education Scholars Amici Curiae.

Jeffrey P. Dunlaevy, of Dunlaevy Law Firm, of Greenville; Lauren Lee Greuel and Cory Jennifer Brewer, of Milwaukee, WI; and David C. Tryon, of The Buckeye Institute, of Columbus, OH, all for the Wisconsin Institute for Law & Liberty and the Buckeye Institute Amici Curiae.

**JUSTICE HILL:** Before us is a challenge by Petitioners to the constitutionality of 2023 Act No. 8 (S. 39), known as the Education Scholarship Trust Fund (Act). We hold portions of the Act violate South Carolina's constitutional prohibition against the use of public funds for the direct benefit of private educational institutions.

## I.

Section 1 of the Act establishes the Education Scholarship Trust Fund (ESTF) to be held and managed by the South Carolina Department of Education (the Department). S.C. Code Ann. § 59-8-120(A), (B) (Supp. 2023). The ESTF consists of "monies appropriated to the [D]epartment to provide scholarships to eligible students for qualifying expenses." § 59-8-120(A). The ESTF holds these monies "until disbursed." *Id*. Once a parent requests and the Department approves a student's application for a scholarship for qualifying educational expenses, the State Treasurer transfers $6,000 per student to the ESTF. S.C. Code Ann. § 59-8-120(C) (Supp. 2023). Within thirty days of approval, the Department must create an individual online ESTF account for each scholarship student. S.C. Code Ann. § 59-8-120(D) (Supp. 2023). The parent accesses the account to authorize the Department to disburse the scholarship funds to an education service provider through the Department's online electronic portal. S.C. Code Ann. § 59-8-120(D), (G) (Supp. 2023); S.C. Code Ann. § 59-8-125(A) (Supp. 2023). The Department is to make

quarterly payments from the ESTF to the student's individual ESTF account. S.C. Code Ann. § 59-8-120(E) (Supp. 2023).

The funds may only be used for "qualifying expenses as defined in this chapter and provided by the [D]epartment." § 59-8-120(G). The Act enumerates a range of qualifying education expenses, from fees for advanced placement exams and other supplemental educational services (such as speech or occupational therapy), to tuition at full-time, in-person and online private schools. S.C. Code Ann. § 59-8-110(13) (Supp. 2023). The Act sets out the full list of qualifying expenses:

(a) tuition and fees of an education service provider;
(b) textbooks, curriculum, or other instructional materials including, but not limited to, any supplemental materials or associated online instruction required by either a curriculum or an education service provider;
(c) tutoring services approved by the department;
(d) computer hardware or other technological devices that are used primarily for a scholarship student's educational needs and approved by the department or a licensed physician;
(e) tuition and fees for an approved nonpublic online education service provider or course;
(f) fees for approved:
    (1) national norm-referenced examinations, advanced placement examinations, or similar assessments;
    (2) industry certification exams; or
    (3) examinations related to college or university admission;
(g) educational services for pupils with disabilities from a licensed or accredited practitioner or provider including, but not limited to, occupational, behavioral, physical, and speech-language therapies;
(h) approved contracted services from a public school district, including individual classes, after school tutoring services, transportation, or fees or costs associated with participation in extracurricular activities;
(i) contracted teaching services and education classes approved by the department;

> (j) fees for transportation paid to a fee-for-service transportation provider for the scholarship student to travel to and from an eligible provider as defined in this section, but not to exceed seven hundred fifty dollars for each school year;
>
> (k) fees for ESTF account management by private financial management firms approved by the department; or
>
> (l) any other educational expense approved by the department.

*Id*. An "Education service provider" is defined as "a person or organization approved by the department that receives payments from ESTF to provide educational goods and services to scholarship students." S.C. Code Ann. § 59-8-110(7) (Supp. 2023).

Interestingly, the Act defines "Eligible school" as "a South Carolina public school or an independent school that chooses to participate in the program," except a charter school. S.C. Code Ann. § 59-8-110(3) (Supp. 2023). But the term "eligible school" never appears again in the Act. And, as noted above, the education service provider cannot simply choose to participate; it must be approved by the Department. § 59-8-110(7). To be eligible for a scholarship, a student must be a state resident who attended a South Carolina public school during the previous year (or was too young to do so, or received an ESTF scholarship the previous year), and meets certain household income levels. S.C. Code Ann. § 59-8-110(4) (Supp. 2023).

If adequate funds are available, the Department must approve an ESFT scholarship application as long as the parent signs an annual agreement with the Department promising to abide by various rules, including not to enroll the student in a public school as a full-time student in the school district in which the student is domiciled, or to participate in certain home instruction programs. S.C. Code Ann. § 59-8-115(E) (Supp. 2023).

The Act designates the Department to manage both the ESTF and scholarship program. However, the Act limits what the Department may regulate through the scholarship program. For example, the Act mandates that approved education service providers must not "unlawfully discriminate on the basis of race, color, or national origin" and full-time, in-person schools must be located in South Carolina, have a curriculum that meets South Carolina's diploma requirements, and meet compulsory attendance and other State Board of Education approval requirements.

S.C. Code Ann. § 59-8-140(A)(2) (Supp. 2023); S.C. Code Ann. § 59-8-150(A)(3) (Supp. 2023). But the Act also decrees that participating nonpublic school education service providers will remain "autonomous" and shall not become "agent[s] of the state." S.C. Code Ann. § 59-8-150(F) (Supp. 2023). The Act further states the Department may not regulate "the educational program of an approved education provider that accepts funds from an account" and "education service providers shall not be required to alter their creeds, practices, admissions policy, or curriculum in order to accept payments." *Id*.

This action began when Petitioners filed a complaint seeking an injunction and declaratory judgment that the Act violates numerous provisions of South Carolina's constitution, including Article XI, Sections 2, 3, and 4, as well as Article X, Sections 5 and 11. We accepted the case in our original jurisdiction.

## II.

Under our system of government, the legislative power of the General Assembly is limited only by the state and federal constitutions. The power of the General Assembly to enact laws may only be checked by the law of the Constitution, which the people have deemed supreme. In deciding the constitutionality of legislation, we therefore turn to the Constitution to see what it forbids, not what it permits. Our review must stay within the familiar bounds: we start by presuming the statute is valid, and construe it in a way that will uphold its validity, if at all possible. *City of Rock Hill v. Harris*, 391 S.C. 149, 154, 705 S.E.2d 53, 55 (2011). But if, after applying the required presumptions and interpretive rules, it still appears it has been proven beyond a reasonable doubt that that the statute is unconstitutional, this same rule of law requires the Court to fulfill its solemn duty by saying so.

## III.

The Governor asserts Petitioners lack standing to challenge the Act's constitutionality. We have consistently—but cautiously—held that our standing rules may be relaxed when the case involves a matter of wide public importance and resolution of the case is needed for future guidance affecting the public interest, not merely the interests of private litigants. *S.C. Pub. Int. Found. v. Wilson*, 437 S.C. 334, 342–43, 878 S.E.2d 891, 895–96 (2022). In many cases, we have found future guidance is needed when the legality of the expenditure of public funds is at issue. *See Sloan v. Dep't of Transp.*, 365 S.C. 299, 302, 304–05, 618 S.E.2d 876, 877–79 (2005) (applying public importance exception to standing when it was

alleged the department of transportation violated statutory bidding requirements); *Baird v. Charleston Cnty.*, 333 S.C. 519, 531, 511 S.E.2d 69, 75 (1999) (applying public importance exception to standing when it was alleged "County committed an ultra vires act by exceeding its statutory authority to issue the hospital bonds"). We recently applied the public importance exception to address whether the government's decision to use public funds for tuition grants to private schools violated Article XI, Section 4. *See Adams v. McMaster*, 432 S.C. 225, 235–36, 851 S.E.2d 703, 708–09 (2020) (applying public importance exception to standing when it was alleged Governor's SAFE Grants program was an impermissible expenditure of public funds for private schools). Because this case concerns legislation involving the annual transfer of $90 million dollars from the public treasury to what Petitioners claim is for the benefit of private interests in violation of clear constitutional commands, we do not hesitate to hold Petitioners have satisfied the requirement for public importance standing. *See* S.C. Code Ann. §§ 59-8-120 and -135 (Supp. 2023) (permitting 15,000 scholarships of up to $6,000 per scholarship under the Act in 2026 and all subsequent years).

## IV.

Petitioners first claim the Act violates Article XI, Section 4 of the South Carolina Constitution, which states:

> No money shall be paid from public funds nor shall the credit of the State or any of its political subdivisions be used for the direct benefit of any religious or other private educational institution.

According to Petitioners, because the ESTF scholarships may be used for private school tuition, the Act uses public funds to directly benefit private educational institutions. Respondents counter the Act comports with Article XI, Section 4 because no public funds are involved and the Act confers no direct benefit on private schools. We first take up Respondents' argument that the ESTF funds are not "public funds." We then address Respondents' claim that, even if the funds are public funds, the Act does not permit payment from them for the "direct benefit" of private educational institutions.

**A.** Whether the ESTF Consists of "Public Funds"

Respondents' primary argument is that the funds start out as public funds but lose their public character once the Treasurer places the funds in the ESTF. At that point, according to Respondents, the funds become private because, under the trust structure of the ESTF, the scholarship recipients are the beneficial owners of the funds, extinguishing the public nature of the monies. We find this argument unconvincing for several reasons.

In the first place, we are skeptical the ESTF is meant to function as a true trust. *See* S.C. Code Ann. §§ 62-7-101 to -1106 (2022 & Supp. 2023) (regulating the creation and implementation of trusts in South Carolina, including the requirements that a trustee has fiduciary duties to beneficiaries); *Protestant Episcopal Church in Diocese of S.C. v. Episcopal Church*, 439 S.C. 284, 302–03, 887 S.E.2d 508, 517–18 (2022) (discussing state law requirements for creating a trust). For example, the Act never tells us who the trustee is, and a trust generally may not be administered until a trustee is installed and accepts the trusteeship. S.C. Code Ann. § 62–7–701 (2022). When examining the actual mechanics of the ESTF, it most resembles a government budget allocation tool, where public funds are earmarked for specific government spending projects and are therefore "trusts" in name only. *See, e.g.*, John H. Langbeinn, *The Secret Life of the Trust: The Trust As an Instrument of Commerce*, 107 Yale L.J. 165, 167 (1997) (describing "various governmental budgeting conventions" that have "misappropriated" the trust label, such as "the Leaking Underground Storage Tank Trust Fund, the Violent Crime Reduction Trust Fund, or the Highway Trust Fund," and "have, at best, only a metaphorical connection to actual trust practice").

Assuming, without deciding, the ESTF is a true trust, Respondents are right that the beneficiaries of a trust have equitable or beneficial title to trust funds. *See* S.C. Code Ann. § 62-7-103(2) (2022) (defining "Beneficiary" of a trust); *see also Epworth Children's Home v. Beasley*, 365 S.C. 157, 170–71, 616 S.E.2d 710, 717 (2005) (describing testamentary trust and stating, "[t]he beneficiary holds the equitable estate or title and enjoys the benefits of the estate"). But it is equally right that the trustee holds legal title to the trust property until it is transferred consistent with the trust terms. *See Neel v. Clark*, 193 S.C. 412, 416, 8 S.E.2d 740, 742 (1940) ("A trustee is a person holding the legal title to property, under an express or implied agreement to apply it, and the income arising from it, to the use and for the benefit of another person, who is called the cestui que trust." (quoting 26 R.C.L. 1271)). The very essence of a valid trust is the division of legal and equitable ownership.

*See Morgan v. Merchants & Planters Nat. Bank, Gaffney*, 247 S.C. 435, 441, 147 S.E.2d 702, 705 (1966) ("A fundamental essential of any trust is separation of the legal estate from the equitable estate and the beneficial enjoyment[.]" (quoting 54 Am. Jur., Trusts § 35)). The Act states that once the Treasurer places the funds in the ESTF, the funds may only leave the ESTF for direct payment to an education service provider. This means the State—the owner of legal title of the funds—only relinquishes its ownership and control upon payment to an education service provider. The scholarship recipients may not access or use the funds in any other way. Therefore, even under a true trust structure, the ESTF funds remain public funds until they are disbursed.[1]

This is not the first time we have encountered an attempt to deploy a trust to avoid constitutional limits on the use of public funds. In *O'Brien v. S.C. ORBIT*, 380 S.C. 38, 668 S.E.2d 396 (2008), we addressed a claim that a city's transfer of public funds into a trust that in turn invested the funds in stocks and other equity securities violated Article X, Section 11 of the South Carolina Constitution. *Id*. at 43, 668 S.E.2d at 398. That section provides, in part, that "Neither the State nor any of its

---

[1] In describing the structure of the Act, the dissent states: "From the trust fund, a student's educational dollars are transferred to his or her individual account held at a third-party bank. . . . It is only upon direction from the students' parents that the bank makes payment to the private or public school, or to the provider of the educational services." We can find nothing in the Act that informs this Court ESTF funds travel through a third-party vendor. However, Respondents assert, and have filed an affidavit in support, that the Department has implemented a system where the ESTF funds from the state treasury are "parked" in a private bank account owned by a third-party vendor. From that point, according to the affidavit, the funds are transferred quarterly to a single "segregated" account held at the same bank, and then disbursed to a private school if a parent so chooses. We cannot rely on this affidavit in considering the constitutionality of the Act, especially if, as the dissenting opinion asserts, Petitioners have brought a facial challenge that must rise or fall on the face of the text alone. In a facial challenge, it is not appropriate for this Court to consider factual evidence of how the Act has been applied in determining its constitutionality. We are also alarmed by the content of Respondents' affidavit. If, as the affidavit indicates, individual accounts are not created for each student, and the public funds are no longer held in trust within the ESTF, but instead placed in a single, non-ESTF account controlled by a private bank, we are concerned the Department is not following the mandates of the Act.

political subdivisions shall become a joint owner of or stockholder in any company, association, or corporation." S.C. Const. art. X, § 11. We found it "troubling that the City attempted to avoid the constitutional prohibition on investing in equity securities, thereby using government funds to jointly own a company with other investors, by merely setting up a trust." *O'Brien*, 380 S.C. at 43, 668 S.E.2d at 398. We emphasized that Article X, Section 11 forbade the city from investing in equities and noted the "[i]nvestment takes place when the [c]ity transfers money to the trust to be used for the expressed purchase" of stocks. *Id*. at 43, 668 S.E.2d at 399. We concluded the "veneer" of the trust could not shield the city from this constitutional bar on the use of public funds. *Id*.

We see no daylight between the trust veneer peeled away in *O'Brien* and the trust here. We therefore hold the ESTF funds are "public funds." *See Adams*, 432 S.C. at 238–39, 851 S.E.2d at 709–10 (holding funds owned by the State are public funds); 63C Am. Jur. 2d § 1 (2024) (defining "public funds" as "moneys raised by the operation of law for the support of the government or for the discharge of its obligations").

Despite the glaring precedent of *O'Brien*, Respondents point to *Durham v. McLeod*, 259 S.C. 409, 192 S.E.2d 202 (1972), as supporting their position that the transfer of public funds into a trust alters the constitutional analysis. *Durham* concerned whether a college tuition loan program created by Act 433 of 1971 violated South Carolina Article XI, Section 9. *Id*. at 412, 192 S.E.2d at 203. Article XI, Section 9, which was repealed in 1973, is the precursor to our current Article XI, Section 4 and prohibited public money or the property or credit of the State from being used directly or indirectly to aid any church-controlled college or school. Act 433 designated the Budget and Control Board as the State Education Assistance Authority to provide loans to South Carolina resident students to attend any institution of higher learning, in-state or out-of-state. *Id*. Act 433 authorized the Authority to issue revenue bonds. *Id*. The bonds were to be repaid by the students. *Id*. Any funds received by the Authority were then designated as "trust funds to be held and applied solely toward carrying out the purposes of the Act." *Id*. Act 433 further decreed the bonds did not constitute a debt of the State. *Id*.

We upheld Act 433 because "the student loan fund under the Act is held by the Authority as a trust fund, and that no public money or credit, within the meaning of Article XI, Section 9, is employed in making or guaranteeing loans." *Id*. at 413, 192 S.E.2d at 204. Our decision turned on the absence of public funds, not the existence of the trust. The bond proceeds financed the loans, and the bonds were repaid by

proceeds from the student repayment of the loans. The funds did not originate from the state treasury, and no public money was at risk. It was this structure that assured Act 433's constitutionality. *Durham* does not change our conclusion that the ESTF constitutes public funds.

**B.** Whether the Act uses Public Funds for the "Direct Benefit" of Private Schools

Respondents alternatively argue that, even if the ESTF funds are public funds, they are not paid to or used for the "direct benefit" of private schools within the meaning of Article XI, Section 4. Today we consider whether tuition payments from ESTF funds constitute a "direct benefit" to private educational institutions. We find they do.

Because the text of the Constitution is the surest guide to its meaning, we must give the words used in a constitutional provision their ordinary and popular meaning and enforce them as they were written and approved by the people of South Carolina. *Richardson v. Town of Mount Pleasant*, 350 S.C. 291, 294, 566 S.E.2d 523, 525 (2002). Constitutional interpretation begins with the text itself, and when the meaning of the text is plain that is also where our inquiry ends. Antonin Scalia, *A Matter of Interpretation* at 16 (1997); *see also Smith v. Tiffany*, 419 S.C. 548, 556, 799 S.E.2d 479, 483 (2017) (stating there is no need to embark on a quest to determine whether plain words "mean anything other than what they say" because, "[a]bsent an ambiguity, there is nothing for a court to construe, that is, a court should not look beyond the statutory text to discern its meaning"). To be sure, there are times when carrying out the literal meaning of a constitution's words would carry away the sense and purpose behind the constitution. In such instances, microscopic literalism obscures the meaning of the text, so we must always consider the words in light of the company they keep—their context. Especially when interpreting our Constitution, context is often the key to unlocking the meaning of the words used, and the context extends not only to the sentence or section the words inhabit, but to the entire design and structure of the Constitution of which they are a part. When the text is plain and the context makes the meaning clear, we have no license to alter or shade the plain meaning in an effort to stretch or shrink the scope of the Constitution.

The task at hand is to construe the phrase "direct benefit" as it is used in Article XI, Section 4. Our task is simplified because no one disputes that tuition payments from ESTF funds benefit private schools; the only question is whether the benefit is "direct." The adjective "direct" means "stemming immediately from a source."

*Direct*, Webster's Ninth New Collegiate Dictionary (1983) (giving as example: "direct result"). Once we apply the plain and popular meaning of "direct benefit" to the Act, the presumption of constitutionality withers. *See Gentry v. Taylor*, 192 S.C. 145, 150, 5 S.E.2d 857, 859 (1939) (holding legislative act authorizing county council to issue general obligation bonds to support airport did not constitute "ordinary county purpose" within plain meaning of Article X, Section 6 of the South Carolina constitution, stating, "it is not the province of this Court to change the clear intendment of any provision of the Constitution by construing the language used so as to give it a different meaning from that which it clearly imports").

Respondents say that because the Act gives parents and students a choice of education service provider to fund with tuition payments, there is no "direct benefit" to private institutions and that any benefit is indirect and incidental. Put another way, they read our Constitution as allowing public funds to be directly paid to private schools as tuition as long as the funds are nudged along their path by the student, who may, through an online portal, choose to use the funds that way. The State, Respondents reason, is not directing the payment at all. We dispatched a similar "indirect benefit" argument in *Adams*, which also involved the use of an online portal that recipients would access to transfer the tuition funds to private schools. We held:

> We reject the argument that the SAFE tuition grants do not confer a direct benefit on the participating private schools because unlike the grants in *Hartness* [*v. Patterson*, 255 S.C. 503, 179 S.E.2d 907 (1971)], which were made directly to the student, the SAFE Grants are directly transferred from the State Treasury to the selected school through use of a secure online portal. The direct payment of the funds to the private schools is contrary to the framers' intention not to grant public funds "outrightly" to such institutions. Nevertheless, the Governor argues the student's act of choosing which school to attend and her parent or guardian's direction of the electronic payment attenuate the connection of the funds to the private school so as to transform it into merely an incidental, indirect benefit. This argument is unavailing.

*Adams*, 432 S.C. at 241, 851 S.E.2d at 711. We adhere to our unanimous opinion in *Adams*.

Respondents endeavor to distinguish *Adams* by claiming the ESTF tuition scholarships can be directed to either public or private educational providers. This, Respondents say, is an extra level of attenuation beyond the tuition grant structure in *Adams*. Put another way, Respondents claim that any benefit that may accrue to private schools is not direct because the path the funds must take is not only winding, but its direction may diverge to public schools based on the scholarship recipient's choice. Respondents claim this choice between public and private schools requires a finding that any benefit a private school receives is an indirect product of the scholarship recipient's free will.

The inherent flaw in Respondents' choice argument is that the constitution prohibits "direct benefit." We liken Respondents' choice argument to the adage that "a rising tide lifts all boats." Like the tide, the public funds released by the Act for tuition benefit all education service providers, public and private. But just because the benefit is diffuse does not mean it is not direct; the effect of the tide is the same on all the boats. The fact that the Act allows the Department to hand pick the education service providers (the boats) that the student may choose, which may be private or public, is irrelevant. It is this same direct effect we found unconstitutional in *Adams* and *Hartness*, and this prohibition on using public funds for tuition at a private school is the direct benefit that we hold today Article XI, Section 4 forbids.

*Hartness* involved an Article XI, Section 9 challenge to Act 1191 of 1970, which provided tuition grants to South Carolina students attending any of twenty-one independent institutions of higher learning. 255 S.C. at 505–06, 179 S.E.2d at 907–08. Sixteen of the schools were controlled by religious groups, the remaining five were not religiously affiliated. *Id*. at 506, 179 S.E.2d at 908. We held "the use of public funds under [Act 1191] to provide tuition grants to students attending the participating religious institutions constitutes aid to such institutions within the meaning of, and prohibited by, Article XI, Section 9[.]" *Id*. at 508, 179 S.E.2d at 909. The *Hartness* Court was unpersuaded by the argument that the tuition grants were constitutional because they were made to the student rather than the institutions and the student chose the school they wished to attend. *Id*. at 507–08, 179 S.E.2d at 909. Respondents claim that, because the Act before us endows the scholarship recipient with the same type of choice, the Act provides the benefit to the student and not to private schools. This line of reasoning collapsed in *Hartness*, where the Court stated:

> We reject the argument that the tuition grants provided
> under the Act do not constitute aid to the participating

schools. Students must pay tuition fees to attend institutions of higher learning and the institutions depend upon the payment of such fees to aid in financing their operations. While it is true that the tuition grant aids the student, it is also of material aid to the institution to which it is paid. The fact that only a portion of the tuition costs are covered by the grants from the State affects the matter only in degree. If State funds can be used to provide a portion of the tuition costs for attendance at religious schools, all could just as legally be paid, resulting in the support of such institutions entirely with State funds.

*Id*. at 507–08, 179 S.E.2d at 909.

Article XI, Section 9 prohibited public funds from being "used, directly or indirectly, in aid or maintenance of any" church-controlled institution. The current constitutional provision, by contrast, prohibits payments "from public funds . . . to be used for the direct benefit of any religious or other private educational institution." S.C. Const. art. XI, § 4. Comparing the text of former Article XI, Section 9 with our current Article XI, Section 4, reveals another important difference. The former prohibited direct or indirect "aid or maintenance," while the current bars any "direct benefit." It is not too much to say that "benefit" casts a wider net than "aid or maintenance." As in *Hartness*, we find a student's choice as structured in the Act before us today does not materially alter the nature of the benefit received by private educational institutions when public money is used for tuition at those institutions. If public funds could be used to provide a portion of the tuition costs for attendance at private educational institutions, all could just as legally be paid, resulting in the support of such institutions entirely with public funds.

Respondents also contend *Durham* approved the loan program at issue there precisely because of the feature of choice. *Durham* did state that the "loan is to the student, and all eligible institutions are as free to compete for his attendance as though it had been made by a commercial bank." 259 S.C. at 413, 192 S.E.2d at 203. But this nod to competitive-market choice was not enough, by itself, to avoid the precedent of *Hartness*. After all, if it was enough, the portions of Act 1191 allowing students to choose to use their tuition grants at religious schools would not have been declared unconstitutional in *Hartness*. This explains why the Court in *Durham* hung its hat—and its actual holding—on the finding that the student loans did not constitute public funds, not on some theory of permitting public funds to be

used to gin up competition between public and private schools. For many good reasons, our Constitution was not framed with the idea that public institutions should operate like private business.

At any rate, unlike Act 433 in *Durham*, the Act's playing field for private and public education service providers is not level. The Act here does not open the market for the scholarships to all public and private institutions, but only those the Department chooses and only for students who agree not to attend a public school in their district. For instance, a scholarship student may not use ESTF funds for tuition at another public school outside his or her district unless the out-of-district school's policy permits such a transfer. S.C. Code Ann. § 59-8-165 (Supp. 2023). However, because South Carolina is not an open enrollment state, a student who desires to use an ESTF scholarship for a transfer to a public school may very well be landlocked to their district. If so, that student would only be eligible for an ESTF scholarship if attending a private school and may only use the scholarship to pay for tuition if the tuition is for private school. *See* § 59-8-115 (E)(4)(e) (in order to obtain an ESTF scholarship, a parent must agree "not to enroll their scholarship student in a public school as a full-time student in the resident school district"). This is not the kind of free trade envisioned by Adam Smith or Milton Friedman.

A parent who chooses to use a scholarship to pay their child's private school tuition is undoubtedly using public funds to provide a direct benefit to the private school, a point hammered home in both *Hartness* and *Adams*. After we clear away the window dressing, we can see the Act funnels public funds to the direct benefit of private schools. This is what our constitution forbids. We conclude Petitioners have carried their burden of proving beyond a reasonable doubt the portion of the Act that allows tuition payments from public funds for the direct benefit of private educational institutions violates Article XI, Section 4.

We end this section where we began: with the meaning of the phrase "direct benefit" as used in Article XI, Section 4. At least where the meaning is plain, a court may only enforce the constitution as written and conclude the people meant what they said. Courts tempt fate when they begin deciding cases based not on what the words of the constitution mean but on what they believe the constitution should mean to give legal cover to some fashionable innovation in social policy. Scalia, *supra* at 46. No matter how sound or popular a given legislative policy choice may be, it cannot remain law if it is prohibited by the plain words of the higher law—the Constitution. *See Feldman & Co. v. City Council of Charleston*, 23 S.C. 57, 66 (1885) ("[W]hen the legislature has clearly overstepped its constitutional powers, it

is not only the right, but the duty, of this court so to declare.").  As the author of a definitive treatise on our Constitution emphasized:

> Article X of the Constitution of 1895 is a document that reeks of fiscal restraint.  Especially abhorrent to Article X is the use of public funds by private entities whether they be railroads or hospitals.  In a sense Article XI, section 9, of the original 1895 Constitution, and its current counterpart Article XI, section 4, are an extension of the traditional South Carolina fiscal conservatism to the educational and social services area . . . .  Let private organizations look to private sources.

III James Lowell Underwood, *The Constitution of South Carolina* 170-71 (1992).

If the spending of public funds for the direct benefit of private schools is an idea the people wish to embody in our Constitution (and Respondents proclaim there is public clamor for it), the Constitution provides a ready method to amend its terms— a method that by our count has been successfully used at least 100 times since 1974, including twice in 2022.  But, as a Court mindful of the separation of powers, we have no right to amend by forced judicial interpretation our fundamental founding document simply to fit whatever policy may be fashionable—no matter how wise or foolish it may seem to be.  *Gentry*, 192 S.C. at 150, 5 S.E.2d at 859 (holding legislative policy must bend to constitutional principles: "if the provisions of the Constitution are not broad enough or sufficiently elastic to meet the needs of [legislative policy], . . . that instrument itself provides how" it may be amended "if the people so will"); The Federalist No. 78 (Alexander Hamilton) ("The courts must declare the sense of the law; and if they should be disposed to exercise WILL instead of JUDGMENT, the consequence would equally be the substitutions of their pleasure to that of the legislative body.  The observation, if it proved anything, would prove that there ought to be no judges distinct from that body.").

## V.

Having concluded the Act unconstitutionally allows payments from ESTF funds for tuition at private educational institutions in violation of Article XI, Section 4, we now look to an appropriate remedy.  We are guided by the general rule that a statute "may be constitutional and valid in part and unconstitutional and invalid in part." *Townsend v. Richland Cnty.*, 190 S.C. 270, 280, 2 S.E.2d 777, 781 (1939).  Mindful

of the separation of powers as well as the related concept of judicial restraint, we must craft a remedy that cures the unconstitutional parts of the statute but leaves the rest alone. *See Stone v. Traynham*, 278 S.C. 407, 409, 297 S.E.2d 420, 422 (1982) ("The separation and independence of each branch of government require that we go no further than absolutely necessary in declaring unconstitutional an action of the legislature. Although we are hesitant to declare any portion of a statute unconstitutional, we may invalidate a separable part without impairing the remainder."). But we may only declare a statute unconstitutional in part if it is obvious the General Assembly would have passed the statute without the unconstitutional defects. We can resolve this question quickly, for the General Assembly answered the question for us by including an emphatic severability clause in Section 2 of the Act. That section states:

> If any section, subsection, paragraph, subparagraph, sentence, clause, phrase, or word of this act is for any reason held to be unconstitutional or invalid, then such holding shall not affect the constitutionality or validity of the remaining portions of this act, the General Assembly hereby declaring that it would have passed this act, and each and every section, subsection, paragraph, subparagraph, sentence, clause, phrase, and word thereof, irrespective of the fact that any one or more other sections, subsections, paragraphs, subparagraphs, sentences, clauses, phrases, or words hereof may be declared to be unconstitutional, invalid, or otherwise ineffective.

Section 2 of the Act is an express declaration of unequivocal legislative intent that, if a portion of the Act is found unconstitutional, it may be severed. *Pinckney v. Peeler*, 434 S.C. 272, 288–89, 862 S.E.2d 906, 915 (2021). Accordingly, we sever and find unconstitutional § 59-8-110(13)(e), which allows payments from ESTF scholarships for "tuition and fees for an approved nonpublic online education service provider or course." We also enjoin the Department from disbursing ESTF scholarships for the tuition and fees of nonpublic educational service providers under S.C. Code Ann. § 59-8-110 (13)(a) and (l).

## VI.

Over fifty years ago, the people of South Carolina reaffirmed their commitment to South Carolina's public school system by voting to amend the South Carolina

Constitution to adopt Article XI, Sections 3 and 4, mandating a system of free public schools open to all children and prohibiting public money to directly benefit private schools. 1972 Act No. 1635 (R. 1383, S. 598); 1973 Act No. 42 (R.74, S.91). Since that vote of the people and its ratification by the General Assembly, it has been constitutionally prohibited in South Carolina for the General Assembly to pass a law allowing payments from public funds for the direct benefit of any private educational institution. Today, we hold ESTF funds are public and the portions of the Act allowing ESTF scholarships to be used to pay tuition and fees at private education service providers are unconstitutional.

The dissent believes our decision disregards the history leading to the passage of Article XI, Sections 3 and 4. Although we do not believe a survey of history is necessary to decipher the plain meaning of "direct benefit," we take a moment to review the historical lineage of South Carolina's constitutional past when it comes to education.

South Carolina fist adopted a public school system free and open to all of the State's children in the Constitution of 1868. S.C. Const. of 1868, art. X, §§ 3 and 10. The 1895 Constitution changed things, including the addition of a mandate that South Carolina's black and white children be educated in separate facilities. S.C. Const. of 1895, art. XI, § 7 (1895). But, the constitutional obligation to provide free public education remained. S.C. Const. of 1895, art. XI, § 5 (1895). In 1896, the United States Supreme Court handed down the infamous decision in *Plessy v. Ferguson*, which legitimized "separate but equal" treatment of black and white citizens by public actors under the U.S. Constitution's Equal Protection Clause, including schools. 163 U.S. 537 (1896), *overruled by Brown v. Bd. of Ed. of Topeka, Shawnee Cnty., Kan.*, 347 U.S. 483 (1954).

That is where the law stood for the next half-century, when a group of black Clarendon County citizens asked about a school bus. It all began with the bus. The parents were perplexed as to why their children had to walk miles to school each day, even fording streams, when the white schools had thirty buses whisking the white children to their school's front door. When the group petitioned the school board to provide buses, board chairman Roderick W. Elliott denied the request. His shameful and offensive reply is not one we will reprint here, but one serious students of South Carolina history know well. Walter Edgar, *South Carolina: A History* 522 (1998).

In 1950, Harry Briggs, a WWII veteran, and twenty other Clarendon County parents of public-school children hired a lawyer named Thurgood Marshall to bring a lawsuit against Elliott and other school officials, challenging the constitutionality of South Carolina's "separate but equal" public school system. *Briggs v. Elliott*, 98 F. Supp. 529 (E.D.S.C. 1951), *vacated*, 342 U.S. 350 (1952); *Briggs v. Elliott*, 103 F. Supp. 920 (E.D.S.C. 1952), *rev'd sub nom. Brown v. Bd. of Educ. of Topeka*, *Kan.*, 349 U.S. 294 (1955). *Briggs v. Elliott* was the first case of its kind in the United States.

As soon as the case began winding its way through the courts, South Carolina's political leaders began searching for a way to unwind the State's constitutional obligation to provide free public schools. *Briggs* posed the threat that the federal courts might overrule *Plessy v. Ferguson* and declare that public schools could no longer racially discriminate. This meant South Carolina public schools might have to be integrated. To avoid this, some political leaders in the State urged that the (overwhelmingly white) electors vote on a referendum on whether the South Carolina Constitution should be amended so as to no longer obligate the State to provide a public school system. As Governor James F. Byrnes stated to the South Carolina Education Association in 1951:

> If the Court changes what is now the law of the land, we will, if it is possible, live within the law, preserve the public school system, and at the same time maintain segregation. If that is not possible, reluctantly we will abandon the public school system.

Governor James F. Byrnes, Address to the South Carolina Education Association at the Township Auditorium, Columbia, SC (March 16, 1951). The political leadership did not wait for the Court's ruling to present the referendum to the voters. It passed by a wide margin. 1952 Act No. 902 (R. 760, S. 462). In 1954, as we know, *Briggs* was decided as a companion case to *Brown v. Board of Education*, overturning *Plessy*. 347 U.S. 483, *supplemented sub nom. Brown*, 349 U.S. 294. Segregation of public spaces and "separate but equal treatment" by public actors was dead as a matter of law. In turn, the General Assembly ratified the repeal of South Carolina's constitutional mandate to provide public schools and repealed South Carolina's compulsory attendance law. 1954 Act No. 653 (R. 740, S. 488); 1955 Act No. 57 (R. 90, S. 29). The political establishment of the 1950s had seen the handwriting on the wall. By abolishing its constitutional and statutory obligations to educate its citizens, it was unclear how they envisioned South Carolina's children would learn to read and write.

The tooth and nail fight for integration lasted nearly a generation. When Harvey Gantt was denied admission to Clemson on the basis of his race, the State turned to the courts to resist his admission to Clemson. In 1963, when the Fourth Circuit ordered the State to comply with the law, Gantt (the future mayor of Charlotte) peacefully entered. *Gantt v. Clemson Agr. Coll. of S.C.*, 320 F.2d 611 (4th Cir. 1963). Within months, the General Assembly passed Act 297 of 1963. 1963 Act No. 297 (R. 493, H. 1155). Act 297 was a "school choice" law that provided publicly-funded tuition for any South Carolina school-aged child who wished to attend private school. *Id.* The tuition grant idea came from the Gressette Committee as a way to foil integration.

The same year Act 297 passed, the United States District Court halted Charleston County's attempt to prohibit black children from enrolling in white public schools. *Brown v. Sch. Dist. No. 29, Charleston, S.C.*, 226 F. Supp. 819 (E.D.S.C. 1963), *aff'd sub nom. Brown v. Sch. Dist. No. 20, Charleston, S.C.*, 328 F.2d 618 (4th Cir. 1964).

As a new generation of leaders emerged in the 1960s, the old guard's grip on the State began to shake. In 1963, the same day Harvey Gantt argued his case in the Fourth Circuit, Governor Ernest F. Hollings warned in his farewell address:

> As we meet, South Carolina is running out of courts. If and when every legal remedy has been exhausted, this General Assembly must make clear South Carolina's choice, a government of laws rather than a government of men. As determined as we are, we of today must realize the lesson of one hundred years ago, and move on for the good of South Carolina and our United States. This should be done with dignity. It must be done with law and order.

Governor Ernest F. Hollings, Address to the General Assembly of South Carolina, Columbia, SC (January 9, 1963); Edgar, *supra*, at 538. In Clarendon County, where *Briggs* began, the United States District Court ordered integration of its public schools in 1966, quoting the following from *Brown* in doing so:

> Today, education is perhaps the most important function of state and local governments. Compulsory school attendance laws and the great expenditures for education both demonstrate our recognition of the importance of education to our democratic society. It is required in the

performance of our most basic public responsibilities, even service in the armed forces. It is the very foundation of good citizenship. Today it is a principal instrument in awakening the child to cultural values, in preparing him for later professional training, and in helping him to adjust normally to his environment. In these days, it is doubtful that any child may reasonably be expected to succeed in life if he is denied the opportunity of an education. Such an opportunity, where the state has undertaken to provide it, is a right which must be made available to all on equal terms.

*Miller v. Sch. Dist. No. 2, Clarendon Cnty.*, S.C., 253 F. Supp. 552, 558 (D.S.C. 1966) (quoting *Brown*, 347 U.S. at 493). Still, the State's resistance to integration shifted to local school boards, who passed a patchwork of "freedom of choice" laws that were nothing less than token nods to compliance with *Brown*. Robert Green, *School Reform South Carolina Style: Mid-Twentieth Century to Present*, *in The Organization of Public Education in South Carolina* 44 (1992); J. Harvie Wilkinson III, *From* Brown *to* Bakke*: The Supreme Court and School Integration: 1954-1978* 102-18 (1979).

In 1967, the General Assembly reinstated compulsory school attendance despite the earlier opposition of Speaker Solomon Blatt. 1967 Act No. 131 (R. 183, H. 1310); Edgar, *supra*, at 543. But the leadership could not yet bring itself to embrace integration. Meanwhile, reformers secured the creation of a committee to study and propose an update to the 1895 Constitution. They also secured significant seats on the committee, which became the "West Committee."

The use of public funds to finance private elementary and high schools was halted in 1968, when Act 297's "school choice" legislation was once again recognized by the courts for what it was, an attempt to evade constitutional law. *See Brown v. S.C. State Bd. of Ed.*, 296 F. Supp. 199, 202 (D.S.C. 1968), *aff'd sub nom. S.C. State Bd. of Educ. v. Brown*, 393 U.S. 222 (1968) (holding Act 297 of 1963 which provided scholarship grants from State funds to every student "who desires to attend a private school within this state" because "the cause of primary and secondary education in South Carolina will be advanced if individual children of school age, their parents and guardians, are made free to choose between public and private educational institutions" was an unconstitutional attempt to circumvent the requirement that "the State of South Carolina not discriminate on the basis of race or color in its public

educational system"). The same year, Governor Robert E. McNair declared he would oppose any attempt to close down public schools and repeated Governor Hollings' refrain to peacefully accept integration as both law and fact of the land. Edgar, *supra*, at 543 (noting McNair's stance meant the "New South" had prevailed: "Preserving public education was more important to South Carolina than maintaining segregation"). Months later, United States District Judge J. Robert Martin ordered all South Carolina public schools to integrate. *Whittenberg v. Greenville Cnty. Sch. Dist.*, 298 F. Supp. 784 (D.S.C. 1969); *see also Stanley v. Darlington Cnty. Sch. Dist.*, 424 F.2d 195 (4th Cir. 1970).

In 1969, the West Committee formally recommended the South Carolina Constitution be amended to reinstate provision for a system of free public schools, open to all; to repeal the mandate to segregate schools by race; and to prohibit public funds from being "granted outrightly" to private schools. *Final Report of the Committee to Make a Study of the South Carolina Constitution of 1895*, State House, Columbia, June 1969, 99–103. When the State repeatedly lost its appeals of orders to integrate South Carolina's public-school districts, the State finally junked its dual school system. By the early 1970s, integration of South Carolina's public schools had, for the most part, finally become a reality. In 1972, the people of South Carolina voted to amend South Carolina's Constitution to adopt Article XI, Sections 3 and 4, and repeal Article XI, Section 7. 1972 Act No. 1635 (R. 1383, S. 598). In 1973, the General Assembly ratified the amendments. 1973 Act No. 42 (R.74, S.91). This is the history and context of the times that drove the West Committee's Report and our Constitution.

## VII.

We take a moment to respectfully address several points raised by our friends in dissent. The dissent reads our opinion as defining "'direct benefit' so broadly that it swallows any possible meaning of 'indirect benefit' in the process." This is a misreading. The General Assembly can expend public funds that indirectly benefit private educational institutions. In fact, today we uphold over ten different ways the General Assembly has explicitly done so in the Act. *See* S.C. Code Ann. § 59-8-110(13)(b) to -(d) and (f) to -(l) (listing qualifying expenditures of ESTF funds that do not directly benefit private schools and are therefore constitutional, described accurately by the dissent as including "tutoring services, computer assistance, a host of therapies for pupils with disabilities, and transportation-related services"). The other many possible and hypothetical forms such indirect benefits may take are neither before us nor limited by us today; they are limited only by the creative

imagination of our able General Assembly working in the laboratory of democracy and by the Constitution the citizens have democratically adopted.

Still, the dissent tells us that the "test" we announce today places numerous State programs "through which public funds flow directly to private educational institutions" in jeopardy. The dissent points to "First Steps" and other scholarship programs. None of these programs employ the same structure as the Act before us.

The dissenting opinion takes us to task for not adopting its version of the history and evolution of the constitutional ban on the use of public funds for private educational purposes. According to the dissent, we ignore the fact that Article XI, Section 4 does not prohibit "indirect" aid like its precursor textually did. We already mentioned this change, along with the difference between "aid" and "benefit," in Section IV. Nevertheless, the dissent contends this change, along, with the statement of the West Committee, provide context essential to understanding the true meaning of the term "direct benefit." We are satisfied that here the best evidence of the intent behind constitutional words are the words themselves.

It is true that the past can inform the present, but it cannot change the meaning of plain words. If the public meaning of "direct benefit" was somehow murky to the people in 1973, a detour into the mists of history might be appropriate. *See, e.g.*, *Timmons v. S.C. Tricentennial Comm'n*, 254 S.C. 378, 401, 175 S.E.2d 805, 817 (1970) (explaining this Court may look to legislative history, including committee reports, when the text is ambiguous, but when it is "clear and explicit" there is no need to survey legislative history to determine the force of the words). Nevertheless, as detailed in Section VI, the historical context of the passage of Article XI, Sections 3 and 4 informs us that, by 1973, the people of South Carolina were reaffirming their commitment to public schools and enshrining in the Constitution that they would no longer tolerate public money directly benefiting private schools.

The dissent views the West Committee's Report, which was issued four years before the 1973 amendments were ratified, as the Rosetta Stone that provides the key to the meaning of the "direct benefit" phrase in Article XI, Section 4. We have several responses to this.

First, in considering the meaning of a text, a court should not consider materials outside the text unless the text is ambiguous. When the text is not ambiguous, then what the General Assembly said in the text is what the General Assembly meant and intended. In the face of a plain text, extraneous sources—such as legislative

history—are of no value in the search for meaning. Using them would be like consulting an unreliable map after one has already arrived at his destination. At best, they represent unenacted legislative intent. *Aldridge v. Williams*, 44 U.S. 9, 24, 11 L. Ed. 469 (1845) ("The law as it passed is the will of the majority of both houses, and the only mode in which that will is spoken is in the act itself[.]"); *see also Tallevast v. Kaminski*, 146 S.C. 225, 236, 143 S.E. 796, 799–800 (1928)("The law as it is passed is the will of the majority of both houses, and the only mode in which that will is spoken is in the act itself, and the rule that the intention of the Legislature is the primary consideration in the construction of a statute does not permit the courts to consider statements made by the author of a bill or by those interested in its passage, or by members of the Legislature adopting the bill, showing the meaning or effect of the language used in the bill as understood by the person or persons making such statements." (quoting 25 R. C. L. 1037, 1038)).

This is true even of the West Committee's Report, a document we have relied on but only when seeking to divine the meaning of an ambiguous constitutional provision. *See, e.g.*, *Williams v. Morris,* 320 S.C. 196, 203, 464 S.E.2d 97, 100 (1995) (considering the West Committee's Report, along with other logic, law, and longstanding South Carolina practice to decipher meaning of an ambiguous constitutional provision found in Article IV, Section 21 of the Constitution). The statements made by the West Committee are just that: statements. The statements did not become law, there is no evidence the public relied upon them in voting for the adoption of the 1973 amendments, and, in fact, the statements do not even represent a legislative consensus, as many of the Committee's members were private citizens. The point is that "we are a Government of laws, not of committee reports." *Wisconsin Pub. Intervenor v. Mortier*, 501 U.S. 597, 621 (1991) (Scalia, J., concurring).

Our General Assembly knew how to draft an amendment to present to the people that would allow public funding for private schools, but it did not. With the replacement of Article XI, Section 9 with Article XI, Section 4, South Carolina expanded the constitutional prohibition on public funding for religious education to a constitutional prohibition on public funding that directly benefits *any* private school.

Second, the statement from the West Committee's Report reveals the West Committee is explaining that, by amending the Constitution to remove the bar against "indirect" aid, "the General Assembly could establish a program to aid students and perhaps contract with religious and private institutions for certain types

of training programs." This cryptic reference to some vague aid to students can only be understood by remembering that the Committee had just emphasized that it "feels public funds should not be granted outrightly to such institutions." Respondents argue that using the students as conduits through which public funds flow directly to private schools for tuition payments does not have any constitutional significance, for the tuition payments are not being made "outrightly" to the private schools. We rejected this very argument in *Adams*, and it is no better today.

The West Committee emphasized that the "direct benefit" phrase had ample teeth. That is why it was careful to say that by removing the word "indirectly" the State could "perhaps contract" with private schools "for certain types of training and programs." Our decision today upholds the Act's provisions allowing public funds to be used for these types of training and programs. But our decision draws the line at tuition payments for private institutions.

The West Committee meeting at issue occurred six years before the people's adoption of Article XI, Section 4. The amendment presented to the voters did not include or reference the West Committee or any of its statements. At any rate, a close reading of the minutes of this meeting discloses that the Committee members were focused on trying to find some constitutionally appropriate way to aid students wishing to attend private colleges within South Carolina. But much of the back and forth is contradictory, and many of the statements lack background or explanation. And, the Committee lacked the benefit of *Hartness*, for it had not yet been decided. *See Hartness*, 255 S.C. at 507–08, 179 S.E.2d at 909 ("While it is true that the tuition grant aids the student, it is also of material aid to the institution to which it is paid.").

One thing is undisputed, though. The language that ended up being the "direct benefit" clause came straight from the Alaska Constitution. This is important, for the Alaska Supreme Court later held a state program that provided tuition grants to residents attending private colleges in Alaska violated the "direct benefit" clause. *Sheldon Jackson Coll. v. State*, 599 P.2d 127 (Alaska 1979). The *Sheldon* Court held the following factors were relevant to deciding whether state funding crossed this "direct benefit" line: 1) whether the public funds are available to all students, not just those attending private institutions; 2) whether the public funds are to be used for pure educational programs or general, incidental maintenance of private institutions; and 3) the magnitude of the benefit conferred. *Id*. at 130. Applying the factors to the tuition grant program, the *Sheldon* Court first concluded that the program benefitted only private schools because "the only incentive it creates is the incentive to enroll in a private college." *Id*. at 131. Second, the program

"constitute[d] nothing less than a subsidy of the education received by the student at his or her private college, and thus implicate fully the core concern of the direct benefit provision." *Id.* (holding that "[w]hile the program may be motivated, as was stated in the preface to the statute as it was originally passed, by the desire to 'help retain qualified students in Alaska,' such a laudable purpose cannot escape article VII's mandate that Alaska pursue its educational objectives through public educational institutions"). Third, the magnitude of the benefit was substantial as it awarded thousands of dollars to each student. *Id.* at 131–32.

The *Sheldon* Court was not persuaded by the argument—which Respondents echo here—that there was no "direct benefit" to the private schools since the grants were paid directly to the students. *Id.* at 132. (holding the student is "merely a conduit for the transmission of state funds to private colleges"); *see also Almond v. Day*, 89 S.E.2d 851, 857 (Va. 1955) ("Tuition and institutional fees go directly to the institution and are its very life blood.").

The tuition payment provisions of the Act before us would not pass the *Sheldon* test. Although the class of students included in the Act ostensibly extends to public school students, as we have noted the Act only covers public school students who are enrolled in public schools outside their own district. In order to receive access to the Act's spectrum of benefits, the Act requires the student not be enrolled in a public school in his resident district. We therefore leave it to the reader to decide whether the Act incentivizes private over public education. In addition, the tuition benefits directly subsidize the educational function of private schools and are not merely incidental support. And, as in *Sheldon*, the size of the tuition benefit is significant.

Finally, as in *Sheldon*, the students are merely conduits for the public funds. The Act's architecture may be elaborate, but it still overlays an unconstitutional foundation. Sophisticated designs can be just as unconstitutional as simple-minded ones. *Lane v. Wilson*, 307 U.S. 268, 275 (1939).

The dissent claims our decision "pulls the rug out" from under the feet of the General Assembly and "ultimately, the feet of the students the law was designed to serve." Our duty is to serve the Constitution, the supreme policy of our land. As such, our obligation is not to allow a rug to cover up well marked constitutional ground, no matter how inconvenient that ground may prove to be to otherwise arguably salutary policies. The entire concept behind the Constitution and the rule of law is that the end cannot justify the means.

Our respected dissenting colleagues deem our decision today as "policy driven" and an "effort to minimize the General Assembly's plenary authority to legislate." The dissent believes—in good faith—that we have overstepped proper judicial bounds. We can disagree with our colleagues over the precise boundaries, but there can be no credible disagreement that the courts have the right and duty of judicial review. *Feldman & Co*, 23 S.C. at 66. ("[O]ne of the very objects for which this court was constituted, was to determine finally, not only the construction, but also the constitutionality of the laws passed by the law-making power."). It is our good-faith belief that today's decision is faithful to the concept of judicial review set forth by our founders:

> [T]he courts were designed to be an intermediate body between the people and the legislature, in order, among other things, to keep the latter within the limits assigned to their authority. The interpretation of the laws is the proper and peculiar province of the courts. A constitution is, in fact, and must be regarded by the judges, as a fundamental law. It therefore belongs to them to ascertain its meaning, as well as the meaning of any particular act proceeding from the legislative body. If there should happen to be an irreconcilable variance between the two, that which has the superior obligation and validity ought, of course, to be preferred; or, in other words, the Constitution ought to be preferred to the statute, the intention of the people to the intention of their agents.
>
> Nor does this conclusion by any means suppose a superiority of the judicial to the legislative power. It only supposes that the power of the people is superior to both; and that where the will of the legislature, declared in its statutes, stands in opposition to that of the people, declared in the Constitution, the judges ought to be governed by the latter rather than the former.

The Federalist No. 78 (Alexander Hamilton).

We take a final moment to address whether Petitioners have failed to successfully mount a facial challenge to the Act. We hold today Petitioners have demonstrated there is no factual application where it is constitutional for ESTF funds to be used

for tuition at private educational institutions.  Therefore, to the extent this is a facial challenge, Petitioners have satisfied their burden.

In light of our decision, we need not address Petitioners' remaining arguments. *Futch v. McAllister Towing of Georgetown, Inc.*, 335 S.C. 598, 613, 518 S.E.2d 591, 598 (1999).

**RELIEF GRANTED IN PART.**

**Acting Justices Donald W. Beatty and James Edward Lockemy, concur. KITTREDGE, C.J., dissenting in a separate opinion, in which FEW, J., concurs.**

**CHIEF JUSTICE KITTREDGE**:  I dissent from the majority opinion's holding that the Educational Scholarship Trust Fund (ESTF) Act provides a "direct" benefit to private educational institutions.  Under the South Carolina Constitution, the use of public funds for the *direct* benefit of a private school is impermissible; the use of public funds for the *indirect* benefit of a private school is entirely permissible.  *See* S.C. Const. art. XI, § 4 ("No money shall be paid from public funds nor shall the credit of the State or any of its political subdivisions be used for the *direct* benefit of any religious or other private educational institution." (emphasis added)).  While at first blush the terms "direct" and "indirect" may seem clearly distinguishable and easily discernible, this Court—and, as a result, the General Assembly—has struggled for years with how to apply them in discrete factual scenarios.

Recently, we reviewed and contrasted the hallmarks of direct and indirect benefits within the meaning of article XI, section 4 of the South Carolina Constitution.  *See Adams v. McMaster*, 432 S.C. 225, 851 S.E.2d 703 (2020).  There, as part of a grant program, Governor McMaster allocated federal funds to be paid directly and exclusively to private, independent schools on behalf of eligible students.  I was part of the unanimous Court that rejected the Governor's effort to characterize the program as only indirectly benefitting private schools; the expenditure of funds was unquestionably direct.  As a result, we found the Governor's direct-benefit grant program unconstitutional.

Subsequently, with a view toward addressing and rectifying the deficiencies identified in *Adams*, the General Assembly carefully crafted legislation to create a program to enable and empower parents to make education-related choices on behalf of their children.  The result of that legislative effort was the ESTF Act.  In my view, unlike the program in *Adams*, the structure and operation of the ESTF Act provide an indirect benefit to schools of the families' choice—both private and public alike.

Nonetheless, the majority opinion today defines the phrase "direct benefit" so broadly that it swallows any possible meaning of "indirect benefit" in the process.  In doing so, the majority opinion pays lip service to the policy-making role of the legislature.  Unfortunately, I have been down this road before.  *See Abbeville Cnty. Sch. Dist. v. State*, 410 S.C. 619, 663, 767 S.E.2d 157, 180 (2014) (Kittredge, J., dissenting) ("I [recognize] the emotional appeal in today's decision [and] acknowledge the self-evident truth concerning the critical importance of public education to the citizens of South Carolina. . . .  I, however, approach this so-called legal case not as a private citizen, but as a judge constrained by the rule of law and the inherent constitutional limitations upon the power of the Judicial Branch.  Based

on my view of the rule of law, especially the principle of separation of powers, I believe the Court has overstepped its bounds."). I cannot in good conscience join the majority opinion, as the result is reached in a manner that is fundamentally opposed to my limited, constitutionally-prescribed duties as a member of the judiciary. Just as I was convinced the Governor's school funding program in *Adams* was unconstitutional, I am firmly convinced the ESTF Act provides an indirect benefit and is facially constitutional. I leave debating the wisdom of the policy underlying the ESTF Act to those with the constitutional authority to enact it. With great respect for the majority, I dissent.

## I.

I take no issue with the standing of Petitioners and the presence of "public funds" in the establishment of the ESTF. However, I do take issue with what I view as the majority opinion's effort to minimize the General Assembly's plenary authority to legislate.

The South Carolina Constitution grants power to the legislature to "enact any act it desires to pass, if such legislation is not expressly prohibited by the Constitution of this state, or the Constitution of the United States." *Heslep v. State Highway Dep't*, 171 S.C. 186, 193, 171 S.E. 913, 915 (1933); *see also Hampton v. Haley*, 403 S.C. 395, 403, 743 S.E.2d 258, 262 (2013) ("[T]he General Assembly has plenary power over all legislative matters unless limited by some constitutional provision."); *Fripp v. Coburn*, 101 S.C. 312, 317, 85 S.E. 774, 775 (1915) ("[T]he Legislature may enact any law not prohibited by the Constitution."). As a result, "A legislative enactment will be declared unconstitutional only when its invalidity appears so clearly as to leave no room for reasonable doubt that it violates a provision of the constitution." *Joytime Distribs. & Amusement Co. v. State*, 338 S.C. 634, 640, 528 S.E.2d 647, 650 (1999).

Here, Petitioners attempt to mount a facial challenge to the ESTF Act. The nature of Petitioners' challenge is of particular significance because,

> A facial challenge to a legislative [a]ct is, of course, the most difficult challenge to mount successfully, since the challenger must establish that *no set of circumstances* exists under which the Act would be valid. The fact that the [legislative act] might operate unconstitutionally under some conceivable set of circumstances is insufficient to render it wholly invalid, since [the United States Supreme Court has] not recognized an

"overbreadth" doctrine outside the limited context of the First Amendment.

*United States v. Salerno*, 481 U.S. 739, 745 (1987) (emphasis added); *see also Planned Parenthood S. Atl. v. State,* 440 S.C. 465, 477, 892 S.E.2d 121, 128 (2023) (*Planned Parenthood II*) (noting that the presumption in favor of the constitutionality of a legislative enactment is especially weighty for facial challenges to the constitutionality of a statute because the challenger must show the law "is unconstitutional in all its applications"). The parties agree that ESTF funds may be awarded to an applicant whose parents then direct the funds be paid to a public school. In such a case, there is unquestionably no violation of article XI, section 4, for public funds are not being paid to a private school. Accordingly, Petitioners' facial challenge necessarily—and easily—fails to pass muster, without any need to interpret whether the benefits of the ESTF Act are direct or indirect. *See Richardson ex rel. 15th Cir. Drug Enf't Unit v. $20,771.00 in U.S. Currency*, 437 S.C. 290, 297, 878 S.E.2d 868, 871 (2022) (explaining that in order to mount a successful facial challenge, a litigant must demonstrate a legislative enactment is unconstitutional under *all* conceivable circumstances (quoting *City of L.A. v. Patel*, 576 U.S. 409, 415 (2015))). However, because the majority opinion misapplies the standard of review, I must continue my own analysis and examine the complexities of direct and indirect benefits, as those terms are meant in article XI, section 4.

## II.

When construing constitutional language, the Court applies the ordinary rules of statutory construction. *Neel v. Shealy*, 261 S.C. 266, 272, 199 S.E.2d 542, 545 (1973) (per curiam) (quoting *McKenzie v. McLeod*, 251 S.C. 226, 161 S.E.2d 659 (1968)). Thus, in the constitutional context, the Court's primary focus must be on ascertaining and effectuating the intent of the framers and the people who adopted a particular constitutional provision. *Id.* at 272–73, 199 S.E.2d 542, 545; *Reese v. Talbert*, 237 S.C. 356, 358, 117 S.E.2d 375, 376 (1960). Constitutional language that is plain and unambiguous, and which conveys a clear and definite meaning, is often the best evidence of the framers' intent or will. *See Hodges v. Rainey*, 341 S.C. 79, 85, 533 S.E.2d 578, 581 (2000). However, even plain constitutional language may not be read in isolation but, rather, must be read in context "in a manner consonant and in harmony with its purpose." *See CFRE, L.L.C. v. Greenville Cnty. Assessor*, 395 S.C. 67, 74, 716 S.E.2d 877, 881 (2011).

In the abstract, the phrase "direct benefit" is not ambiguous.  As the majority opinion states, "direct" means "stemming *immediately* from a source."  (Emphasis added).  The ambiguity—and I am firmly convinced there is uncertainty in the constitutional phrase "direct benefit"—arises when any substance is given to the word "direct" while applying it to a discrete set of facts.  For example, take the majority opinion's chosen definition from Webster's Dictionary considered in isolation.  The funds at issue here which may eventually aid private schools do not come "immediately" from South Carolina's public fisc.  Rather, as I explain further below, the funds move from the State Treasury, to a trust fund held by a third-party bank, to an applicant's individual account, to the school of the applicant's choice (some of which can be private schools).  The majority opinion finds this is a direct benefit to the private school, that is, that public funds are "immediately" going from the State Treasury to the private school.  While reasonable minds could differ on whether this movement of funds is direct *enough* to qualify under article XI, section 4, certainly there must be an acknowledgement that even the majority opinion's chosen definition highlights the ambiguity inherent in applying the phrase "direct benefit."  Interpreting the phrase "direct benefit" will always be a fact-dependent exercise requiring the Court to consider whether a benefit is sufficiently attenuated—or not attenuated enough— to pass constitutional muster.[2]  *See Owens v. Stirling*, Op. No. 28222 (S.C. Sup. Ct. filed July 31, 2024) (Howard Adv. Sh. No. 29 at 61) (Hill, J., concurring) (explaining, in construing the seemingly plain words "cruel" and "unusual," that "when the framers left us with vague terms, they intentionally left interpretation of those terms to the only true power courts have in our republic: our judgment").

---

[2] Unsurprisingly, this Court has not previously set forth a clear definition of either direct or indirect benefit in the past, resolving appeals on a case-by-case basis.  *See Adams*, 432 S.C. 225, 851 S.E.2d 703; *Durham v. McLeod*, 259 S.C. 409, 192 S.E.2d 202 (1972); *Hartness v. Patterson*, 255 S.C. 503, 179 S.E.2d 907 (1971).  Surely, were the phrase "direct benefit" clear and unambiguous, and a dictionary definition the best way to interpret the term, this Court and the General Assembly would not have repeatedly wrestled with the concept over the past fifty years.  *See Adams*, 432 S.C. 225, 851 S.E.2d 703; *Durham*, 259 S.C. 409, 192 S.E.2d 202; *Hartness*, 255 S.C. 503, 179 S.E.2d 907; *see also Bishop of Charleston v. Adams*, 584 F. Supp. 3d 131 (D.S.C. 2022), *rev'd on other grounds*, Op. No. 22-1175, 2023 WL 4363654 (4th Cir. July 6, 2023); H. 5164, 125th Leg., 1st Reg. Sess., as amended Mar. 20, 2024.

Seemingly acknowledging a simple dictionary definition is insufficient to resolve the question presented here, the majority opinion states that "we must always consider the words ['direct benefit'] in light of the company they keep—their context." I agree with the majority that context is important in discerning the intended scope of a "direct benefit," as that term is meant in article XI, section 4. The requisite context cannot be found via a quick, modern dictionary definition, as that reads the term in isolation, unmoored from the surrounding language and historical context. While the majority opinion touts its reading as a simple application of the "plain meaning " rule of constitutional construction, it is contrary to the *cardinal* rule of constitutional construction, that is, ascertaining and effectuating the intent of the framers and the people that voted in favor of the constitutional provision. *Owens*, (Howard Adv. Sh. No 29 at 61) (Hill, J., concurring) ("History, custom, and tradition can be essential to understanding many of the vague and open-ended terms used in our constitutions. . . . [I]t it is often helpful—and necessary—to consider the principle underlying the constitutional right to help determine the contours of the right and to then use common sense to apply it to the facts.").

To understand the phrase "direct benefit" in context here—as that phrase was meant by the framers and the people who voted in favor of the language—requires a review of the history of article XI, section 4, as well as its predecessor, which was contained in article XI, section 9 of the South Carolina Constitution of 1895. The need for this historical review is simple: in the current version of our state constitution, the phrase "direct benefit" no longer keeps company with the phrase "indirect benefit," as it did in the past. More specifically, the predecessor to article XI, section 4 expressly prohibited direct *and* indirect aid benefitting religious schools. *See* S.C. Const. of 1895 art. XI, § 9. In 1966, the General Assembly established a "Committee to Make a Study of the South Carolina Constitution of 1895," commonly known as the West Committee. The West Committee proposed two amendments to what was then referred to as the "no aid" provision in article XI, section 9. One suggested change was to remove the prohibition against indirect aid. The second proposed change broadened the scope of the schools that could not receive direct aid, from only religious schools to all independent schools. In its final report in 1969, the West Committee explained its reasoning:

> **Section D. Public funds for religious and private educational institutions.** The Committee evaluated this section in conjunction with interpretations being given by the federal judiciary to the

"establishment of religion" clause in the federal constitution. The Committee fully recognized the tremendous number of South Carolinians being educated at private and religious schools in this State and that the educational costs to the State would sharply increase if these programs ceased. From the standpoint of the State and the independence of the private institutions, the Committee feels that public funds should not be granted outrightly to such institutions. *Yet, the Committee sees that in the future there may be substantial reasons to aid the students in such institutions as well as in state colleges. Therefore, the Committee proposes a prohibition on direct grants only and the deletion of the word "indirectly" currently listed in Section 9. By removing the word "indirectly[,]" the General Assembly could establish a program to aid students* and perhaps contract with religious and private institutions for certain types of training and programs.

*See Final Report of the Committee to Make a Study of the South Carolina Constitution of 1895*, at 99–101 (1969) (emphasis added).

The General Assembly did not immediately act on this recommendation, and the constitutional prohibition against direct and indirect aid remained. Then, in 1970, the legislature passed a law to provide financial aid for students attending independent higher-education institutions. *See* Act No. 1191, 1970 S.C. Acts 2579. More specifically, Act No. 1191 provided tuition grants directly to eligible students, who then were required to pay the money to the private school—religious or secular—selected by him or her. Following various legal challenges, this Court struck down Act No. 1191 as unconstitutional, holding it provided an indirect benefit to religious schools in violation of article XI, section 9 of the state constitution. *See Hartness v. Patterson*, 255 S.C. 503, 506, 179 S.E.2d 907, 908 (1971) (observing the "aid does not have to be direct but is prohibited if it indirectly benefits the religious schools"). In support of its holding, the Court explained,

It is apparent that one of the main purposes of the tuition grant is to reduce the cost to a student for attending the private colleges and thereby attract additional students to their campuses so as to fill the vacancies in their student body. Such would have the effect of adding additional funds to their treasuries and thereby improve their financial status. It is perhaps better stated in respondent's brief as follows: "The indirect benefit accruing to the private colleges [from the tuition grants] will consist of their being able to attract sufficient students to their

campuses to continue to function."  Such constitutes [indirect] aid to the religious schools.

*Id.* at 508, 179 S.E.2d at 909.

The General Assembly responded swiftly to (and against) the *Hartness* decision by moving forward with the proposed recommendations of the West Committee regarding article XI, section 9.  By 1973, the voters of our state had approved the amendments to the newly-renumbered article XI, section 4, and those amendments were adopted by the legislature.  The constitutional amendments effectively overruled *Hartness* insofar as indirect aid to private schools was no longer prohibited.

Oddly, in striking down the ESTF Act, the majority opinion today recasts *Hartness* as a direct-benefit case: "[The ESTF Act] is th[e] same direct effect we found unconstitutional in *Adams* and *Hartness* . . . ."  *Hartness* manifestly involved an indirect benefit, and I respectfully reject the majority opinion's effort to recast *Hartness* as a direct-benefit case.[3]

_____

[3] The majority opinion disagrees with my discussion of and reliance on *Hartness* as an indirect-benefit case.  To confirm there was no latent ambiguity in the intended reach of the *Hartness* opinion, I carefully reviewed the briefs filed with the Court in that case.  Those briefs unequivocally confirm my reading of *Hartness* and refute the majority's reading; indeed, the appellant's self-styled issue on appeal in that case was whether "an act authorizing tuition grants to students attending schools controlled by religious sects constitute[d] ***indirect aid*** to such schools within the meaning of the state constitutional prohibition against such aid." (Emphasis added).  In the over-fifty years since *Hartness* was decided, there has never been a whisper that the tuition grants involved in that case constituted a direct benefit to religious institutions.

To be clear, I believe the amendment to the former article XI, section 9—getting rid of the prohibition on indirect aid to private schools—overruled the result in *Hartness*: while the indirect aid at issue there was unconstitutional under the former article XI, section 9, indirect aid is now constitutional under the current article XI, section 4.  Therefore, *Hartness* is no longer good law insofar as indirect aid to private schools is no longer prohibited under the South Carolina Constitution.  However, the 1973 constitutional amendment in no way changed the

If context is important—and I believe it is—the meaning and scope of a "direct benefit" can be properly understood only when considered alongside the framers' targeted and purposeful removal of the prohibition against an "indirect benefit" from our state constitution. The presumption of constitutionality aside, all of the evidence demonstrates that the framers of article XI, section 4 understood the removal of the ban on indirect aid would allow the State to provide to students grants and assistance programs that would indirectly benefit private schools. Indeed, the indisputable purpose of the constitutional amendments was to allow indirect aid to private schools.

## III.

Recently, in *Adams*, we set forth a framework for distinguishing between a direct (unconstitutional) benefit and an indirect (constitutional) benefit. In response to the COVID-19 pandemic, Congress passed (and the President signed) the Coronavirus Aid, Relief, and Economic Security Act. Congress appropriated approximately $31 billion to an Education Stabilization Fund. The Secretary of Education was directed to allocate those funds to "sub-funds," one of which was the Governor's Emergency Education Relief (GEER) Fund. South Carolina was allocated $48,467,924 in GEER grant funds. Governor McMaster set aside part of the GEER funds for the Safe Access to Flexible Education (SAFE) Grants Program. The program was designed to make a payment of up to $6,500 per student directly to "participating private or independent schools"; public schools or other, non-private educational providers were not eligible to receive any SAFE grants funds. *Adams*, 432 S.C. at 232–33, 851 S.E.2d at 707.

We found the SAFE grants program unconstitutional, for it involved public funds and provided a direct benefit to private schools. *Id.* at 241, 851 S.E.2d at 711 (holding the "direct payment of the funds to the private schools is contrary to the framers' intention not to grant public funds 'outrightly' to such institutions," and noting the SAFE grants funds were "made available for use only at private educational institutions"). Unlike the majority today, the *Adams* Court did not construe the term "direct benefit" so broadly as to foreclose the legislature from enacting legislation creating a program that would result in an indirect benefit to a

scope of what aid constitutes a direct or indirect benefit. Thus, while *Hartness*'s ultimate holding is no longer good law, its analysis remains a helpful guidepost in determining whether a particular legislative enactment directly or indirectly aids private schools.

private school. Said differently, *Adams* did not establish a categorical rule prohibiting the legislature from ever spending public funds that benefitted private schools.[4] In fact, *Adams* clearly set forth the distinguishing factors between a direct benefit and an indirect benefit. Specifically, we explained, "We reject the argument that the SAFE tuition grants do not confer a direct benefit on the participating private schools because ***unlike the grants in* Hartness, *which were made directly to the student [and only indirectly to the private institution]*, *the SAFE Grants are directly transferred from the State Treasury to the selected school*." *Id.* at 241, 851 S.E.2d at 711 (emphasis added). Similarly, any unused portion of the SAFE tuition grants reverted pro rata directly to the State Treasury from the private school, highlighting the direct nature of the benefit conferred. *Id.* at 240, 851 S.E.2d at 710.

As noted, the General Assembly relied on the *Adams* framework in drafting the ESTF Act to ensure it did not bear the same constitutional defects as the SAFE grants program. Critically, one of the distinctive features of the ESTF Act is that the funds are first paid to a trust and only later—at the sole and explicit direction of the students' parents—to a school of the parents' choosing; the aid is to the student, not directly to the school, and both public and private schools are eligible to be chosen by the parents. A second distinctive feature of the ESTF Act is the fact that any unused funds do not ever revert to the State Treasury.

Accordingly, I conclude that, under *Adams*, the ESTF Act has all the hallmarks of an education-funding program that provides an indirect—and, thus, constitutional—benefit to private schools. While public funds are involved, the funds do not flow directly from the State Treasury to private schools, as they did in *Adams*. Rather, the ESTF program puts students and their parents in the driver's seat, for they alone choose where to spend the allotted funds. The ESTF Act places the funds in a trust, thus removing them from the State Treasury. From the trust fund, a student's educational dollars are transferred to his or her individual account held at a third-party bank. The student's parents select the next recipient, whether a private school

---

[4] In resolving the legal challenge in *Adams*, the Court responded to an argument of the Governor by stating, "Under the facts of this case, we disagree." 432 S.C. at 241, 851 S.E.2d at 711. The decision in *Adams* explicitly turned on its facts, specifically, the congressionally-imposed terms, restrictions, and limitations associated with the use of the GEER funds.

*or* public school *or* a wide array of educational services.[5]  It is only upon direction from the students' parents that the bank makes payment to the private or public school, or to the provider of the educational services.  Of equal significance is that the ESTF program funds, once transferred to the trust, may never revert to the State Treasury.  Rather, after an ESTF applicant's educational dollars are relinquished by the State Treasury and moved from the ESTF trust into his or her individual trust account, any funds unused by that particular student are returned to the corpus of the ESTF trust to benefit another ESTF applicant.[6]

These carefully crafted features of the ESTF program stand in stark contrast to the direct benefits conferred by the SAFE grants program.  *Cf. Niehaus v. Huppenthal*, 310 P.3d 983, 987–89 (Ariz. Ct. App. 2013) ("Under the [Arizona Act], the state deposits funds into an account from which parents may draw to purchase a wide range of services, including therapies, home-based instruction, curriculum, tutoring, and early community college enrollment, from religious, nonreligious, and public

---

[5] Those educational services include tutoring services, computer assistance, a host of therapies for pupils with disabilities, and transportation-related services.

[6] Understanding how the ESTF program operates is critical to understanding the scope of the constitutional words "direct" and "indirect."  To the best of my ability, I have outlined this process by paraphrasing the text of the ESTF Act.  *See generally* S.C. Code Ann. § 59-8-120 (Supp. 2023).  Nonetheless, the majority opinion takes exception to my description of how the ESTF program operates, asserting my description of the ESTF program must have been taken from an affidavit, rather than from statute.  As a result, the majority opinion concludes my description of the ESTF program must be rejected.  Based on the statutes and the parties' submission to this Court, I believe my description of the operation of the ESTF program is accurate.  Moreover, I do not believe any party presents a contrary view of the program's administration.  Nevertheless, the majority opinion concludes otherwise and finds my factual recitation of how the ESTF monies flow is a fatal flaw in my analysis leading to my conclusion that the ESTF program provides an indirect benefit.  It is now for the legislature, if it chooses, to address this purported fatal flaw in the ESTF Act and statutorily clarify whether my view and description of how the ESTF program operates is accurate.  For today, it is sufficient to say that I accept as accurate the parties' representations regarding the intricacies of the ESTF and render my judgment based on the statutes and facts as I understand them.

providers. Thus, unlike in [*Cain v. Home*, 202 P.3d 1178 (Ariz. 2009) (en banc)], in which every dollar of the voucher programs was earmarked for private schools, none of the [Arizona Act] funds are preordained for a particular destination."). As a result, I unequivocally reject today's revisionist approach to *Adams*. The General Assembly followed the path set out in *Adams*, only to have a majority of the Court pull the rug out from under its feet and, ultimately, the feet of the students the law was designed to serve. The ESTF Act provides an indirect benefit to private schools. The *Adams* framework, if honored, requires this Court to uphold the constitutionality of the ESTF Act.

## IV.

Having found the ESTF Act provides a constitutional, indirect benefit, I address Petitioners' remaining arguments.

## A.

Petitioners first argue the ESTF Act violates article XI, section 3 of our state constitution. I disagree. This provision assigns to the General Assembly the responsibility to maintain and support "a system of free public schools open to all children in the State." To accept Petitioners' claim would render the 1973 amendment to article XI, section 4 a nullity, which is precisely what the majority opinion has done in defining "direct" so expansively as to swallow and prevent any benefit to a private school. I would not interpret article XI, section 3 in a way that renders article XI, section 4 surplusage.

Moreover, the "free schools" clause does not act as an implied limit on legislative power. In this regard, Petitioners' reading of the "free schools" clause is incompatible with basic constitutional theory. The General Assembly has plenary authority to legislate, meaning the legislature has power "to 'enact any act it desires to pass, if such legislation is not expressly prohibited by the Constitution of this State, or the Constitution of the United States.'" *Planned Parenthood II*, 440 S.C. at 475, 892 S.E.2d at 127 (citation omitted). The "free schools" clause thus acts as a floor, not a ceiling, on the General Assembly's authority.

In addition, the legislature has substantially increased funding to public schools each year, and this pattern has not been interrupted by the passage of the ESTF Act. In fact, the state's public education system received a record amount of funding in the last state budget.

**B.**

It is next claimed that the ESTF Act unconstitutionally expands the authority of the State Superintendent of Education (the Superintendent). I disagree. The Superintendent is "the chief administrative officer of the public education system of the State." S.C. Const. art. XI, § 2. As with the "free schools" clause, the language in article XI, section 2 must be read as a floor and not a ceiling: the Superintendent is the chief administrative officer of the public school system, but may also be tasked with additional, public-education related responsibilities by the legislature. Petitioners allege that the ESTF Act improperly tasks the Superintendent "with certain administrative and oversight responsibilities over private schools and educational systems." This allegation is meritless, for the Superintendent is granted no authority over private schools. Petitioners apparently misapprehend the nature and purpose of the trust created by the ESTF Act. The Superintendent is required to act as a trustee as she administers the ESTF program. The associated duties with which the Superintendent is charged are statutorily defined, largely ministerial, and tangentially related to the public education system. None of those duties even remotely suggest the Superintendent has power to exercise administrative or oversight authority over any private school.

**C.**

Petitioners' final challenge contends the ESTF Act "violates Article X, Sections 5 and 11 because it uses public funds without a valid public purpose." Again, I disagree. While this Court is the final arbiter of what constitutes a "public purpose" under our constitution, the law demands we discharge our constitutional duty by extending a measure of respect and deference to the Legislative Branch. *See Carll v. S.C. Jobs-Econ. Dev. Auth.*, 284 S.C. 438, 443, 284 S.E.2d 331, 334 (1985) ("The legislative determination as to what constitutes a public purpose or public need is entitled to great weight."). As I stated at the outset, the ESTF Act was designed to enable and empower parents to make education-related choices on behalf of their children. Providing educational opportunities for low-income students is a valid public purpose. "[T]he mere fact that benefits will accrue to private individuals or entities does not destroy public purpose." *Bauer v. S.C. State Hous. Auth.*, 271 S.C. 219, 229, 246 S.E.2d 869, 874 (1978).

The remaining arguments raised by the amici are manifestly without merit. I would dismiss them pursuant to Rule 220, SCACR.

# V.

In conclusion, I dissent from the majority opinion's key holding that the ESTF Act creates a direct benefit to private schools.  Recently, the *Adams* Court recognized the constitutionality of using public funds to indirectly benefit private schools. Whether such a policy is good or bad is not for this Court to decide.  Our constitution allows the legislature—and only the legislature—to make this policy decision.

Today, the majority opinion ignores *Adams* and defines the term "direct" so broadly as to swallow the term "indirect."  In doing so, the majority opinion renders the purpose of the 1973 amendment to article XI, section 4 meaningless and places the continuing constitutionality of indirect aid to private schools on life support.

Consider this critical passage in the majority opinion:

> The inherent flaw in Respondents' choice argument is that the constitution prohibits "direct benefit[s]."  We liken Respondents' choice argument to the adage that "a rising tide lifts all boats."  Like the tide, the public funds released by the Act for tuition benefit all education service providers, public and private.  But just because the benefit is diffuse does not mean it is not direct; the effect of the tide is the same on all the boats.

The majority opinion makes it clear: any legislative educational policy decision that may be characterized as a "rising tide lifts all boats" effort will be deemed an unconstitutional direct benefit.  The majority certainly will not sanction the use of public funds that "benefit all education service providers, public and private."  Even when the benefit is "diffuse," the majority will declare it a direct benefit because, we are told, "the effect of the tide is the same on all the boats."  Public funds may only be spent on a public boat, and there can never be an indirect benefit on a private boat. Thus, under today's decision, public funds may not be spent to indirectly benefit private schools.  The literary style of the majority opinion may be appealing, but its underlying rationale is anathema to the rule of law.[7]

---

[7] To buttress its decision, the majority opinion repeatedly invokes and discusses at length *Brown v. Board of Education*, 347 U.S. 483 (1954), *rev'g Plessy v. Ferguson*, 163 U.S. 537 (1896).  The majority opinion's emotional appeal to *Brown* is presented as essential to understanding the meaning of article XI, section 4 of

The approach taken by the majority opinion today, while presented as the "plain meaning" rule, goes far beyond *Adams* and defines "direct benefit" so broadly as to prohibit any expenditure of public funds on private schools, no matter how indirect or "diffuse." In fact, the test announced by the majority opinion today places many of South Carolina's longstanding and popular scholarships and programs—through which public funds flow directly to private educational institutions—in constitutional doubt. Examples of constitutionally dubious scholarships and programs include the South Carolina HOPE Scholarship, the Legislative Incentive for Future Excellence (LIFE) Scholarship, and the Palmetto Fellow Scholarship. The First Steps 4K Program directs public funds to hundreds of kindergarten programs that are privately owned and operated. These "First Steps" funds are paid directly to the providers, not to the students through their parents. Applying the majority's reasoning, all of these scholarships and programs (and many more) may now be on the chopping block.

With great respect for the majority, I dissent.

**FEW, J., concurs.**

---

our state constitution. There are fifteen parties in this case. The parties are represented by extremely competent counsel. We have been presented with many briefs and dozens of citations to case law and other legal authority. Yet *none of the parties* has cited to or raised the specter of *Brown*, which comes as no surprise as it has nothing to do with direct and indirect benefits to private schools, as those terms are meant in the South Carolina Constitution. As I stated in my dissent in *Abbeville*, "Despite its well-deserved iconic standing in American jurisprudence, *Brown* is not implicated in this case. Invoking *Brown* may make good theater, but it has no relevancy here." 410 S.C. at 680, 767 S.E.2d at 190 (Kittredge, J., dissenting).